STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

18-184


STATE OF LOUISIANA

VERSUS

MARIO JAMAL VILTZ


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 3800-15 "B"
HONORABLE CLAYTON DAVIS, DISTRICT JUDGE


\*\*\*\*\*\*\*\*\*\*


ULYSSES GENE THIBODEAUX
CHIEF JUDGE


\*\*\*\*\*\*\*\*\*\*


Court composed of Ulysses Gene Thibodeaux, Chief Judge, Shannon J. Gremillion, and Candyce G. Perret, Judges.


AFFIRMED.


**John Foster DeRosier**
**District Attorney – 14th Judicial District**
**Cynthia Killingsworth**
**Assistant District Attorney – 14th Judicial District**
**Hope Buford**
**Assistant District Attorney – 14th Judicial District**
**Elizabeth Brooks Hollins**
**Assistant District Attorney – 14th Judicial District**
**901 Lakeshore Drive – Suite 800**
**Lake Charles, LA 70601**
**Telephone: (337) 437-3400**
**COUNSEL FOR:**
    **Plaintiff/Appellee – State of Louisiana**

**Todd Samuels Clemons**
**Todd Clemons & Associates**
**1740 Ryan Street**
**Lake Charles, LA 70601**
**Telephone:  (337) 477-0000**
**COUNSEL FOR:**
     **Defendant/Appellant – Mario Jamal Viltz**

**Adam P. Johnson**
**Johnson & Verchier, L.L.C.**
**P. O. Box 849**
**Lake Charles, LA 70602**
**Telephone:  (337) 433-1414**
**COUNSEL FOR:**
     **Defendant/Appellant – Mario Jamal Viltz**

**Mario Jamal Viltz**
**Allen Correctional Center**
**3751 Lauderdale Woodyard Road**
**Kinder, La 70648**
     **Defendant/Appellant – Mario Jamal Viltz**

**THIBODEAUX, Chief Judge.**

Defendant, Mario Jamal Viltz, was indicted for the second degree murder of A'Tasha "Tay" Lashawn Hardy, a violation of La.R.S. 14:30.1. A jury found him guilty of manslaughter, a violation of La.R.S.14:31. After denying Mr. Viltz's motion for a post-verdict judgment of acquittal on September 28, 2016, the trial court ordered a pre-sentence investigation. On December 12, 2016, the trial court sentenced Mr. Viltz to thirty years at hard labor without benefit of parole, probation, or suspension of sentence, with credit for time served.

On April 6, 2017, Mr. Viltz filed an application for post-conviction relief, seeking an out-of-time appeal after two court-appointed attorneys failed to file a motion for appeal on his behalf. The parties stipulated to reinstating Mr. Viltz's right to appeal, and he timely filed his motion and order for appeal on June 8, 2017. For the reasons that follow, we affirm Mr. Viltz's conviction and sentence.

## I.

## <u>ISSUES</u>

We shall consider the issues raised by Mr. Viltz's counsel. They are whether:

(1) the Defendant's Sixth Amendment rights were violated inasmuch as numerous State witnesses were allowed to testify as to out of court statements, testimonial in nature, made by the alleged victim. As such, the trial court's allowing same violated the confrontation clause of the United States Constitution and the defendant's conviction must be vacated and a new trial ordered.

(2) the Defendant's Sixth Amendment rights were violated inasmuch as he was denied a fair trial by way of ineffective assistance of counsel.

(3)    the evidence introduced at trial was insufficient to sustain a conviction.

(4)    the Defendant received an excessive sentence in violation of the United States and Louisiana Constitutions.

Mr. Viltz also raises four pro se assignments of error:

(1)    constitutional law 840 [sic] - due process - prosecution's suppression of evidence.

(2)    evidence introduced into trial was insufficient to sustain a conviction, reasonable doubt[.]

(3)    ineffective assistance of Counsel Claim, due to non-objection to statement of Assumption of guilt of Petitioner[.]

(4)    excessive sentence[.]


II.

## FACTS AND PROCEDURAL HISTORY

On October 29, 2014, at 2:51 a.m., Officer Shannon Veillon was dispatched to 2504 Anita Drive, Lake Charles, in reference to a battery. Once Officer Veillon arrived on the scene and knocked on the front door, he heard an incoherent female inside the residence. After entering the residence, he observed a black female, later identified as Ms. Hardy, slumped over the couch in the living room with a laceration on her forehead and blood coming from her mouth and nose. She informed the officer that, approximately thirty minutes earlier, a black male, who she could not identify, entered her home by force, opening the locked screen door while she was in the bathroom. She stated that he then threw an end table at her, striking her in the head. Her assailant then dragged her into the living room where he again picked up the wooden end table and struck her again. She stated that

2

she had severe stomach/rib pains and that he may have kicked her in the stomach several times, but she was not sure.

Officer Veillon observed damage to the screen doorframe, but the growth of foliage between the crack in the wood indicated that the damage to the frame predated this incident. He also observed the end table that Ms. Hardy stated was used as a weapon against her upended in the center of the living room and the contents that had previously been on top of the table scattered on the floor.

Ms. Hardy was observed with very slurred speech and had trouble standing or walking, appearing to the officer that she was intoxicated. Several empty containers of alcohol were found throughout the kitchen and living room. Acadian Ambulance (Acadian) arrived on the scene and advised Ms. Hardy that, due to possible internal injuries and/or head injuries, she needed to go to the hospital. After police transported her grandmother, Glenda Rideau, to the scene to stay with Ms. Hardy's young children, Acadian transported Ms. Hardy to Christus St. Patrick Hospital (St. Patrick Hospital).

When Officer Veillon arrived at the hospital, he learned from the hospital staff that Ms. Hardy's behavior and demeanor had deteriorated. Ms. Hardy's hospital bed had been moved to the hallway so staff could better monitor her because she had fallen out of the bed. Officer Veillon then questioned Ms. Hardy as to whether she knew the suspect and if it was her boyfriend. Ms. Hardy responded in the affirmative and correctly spelled his name, provided two addresses where he resided, his birth date, and identified his vehicle.

Ms. Hardy was admitted into the hospital and later transferred to ICU. CT scans revealed massive bleeding in her head. She was pronounced dead on October 31, 2014. According to the autopsy report, prepared by Dr. Terry Weltz,

3

the Calcasieu Parish Coroner and Forensic Pathologist, Ms. Hardy "died as a result of blunt force injuries of the head and abdomen." The manner of death was listed as homicide.

Based upon the victim's statement and the interviews conducted with Ms. Hardy's family members and neighbors, Mr. Viltz was identified as Ms. Hardy's boyfriend. A warrant was then issued for Mr. Viltz's arrest on the charge of second degree murder, and he was subsequently taken into custody and indicted.

At trial, the State first introduced the videotaped testimony of Officer Veillon, who recounted what he observed when he arrived upon the scene and his subsequent interactions with Ms. Hardy. After playing the audiotape of Ms. Hardy's 911 call to the jury, in which she reported her attack but claimed she could not identify her attacker, the State then called Ms. Hardy's grandmother, her mother, Sonya Hardy, and her aunt, Brenda Rideau, to the stand. All three women testified that Ms. Hardy had been involved with Mr. Viltz for more than a year and that they would often see Ms. Hardy with black eyes, which she would try to hide and would not talk about. Ms. Sonya Hardy testified that her daughter told her Mr. Viltz had given her a black eye.

Ms. Brenda Rideau testified that, when she visited her niece in the hospital, she asked her niece if "he," referring to Mr. Viltz, had hit her and Ms. Hardy answered in the affirmative. The State then introduced a number of text messages from Ms. Brenda Rideau's phone to Mr. Viltz in which she accused him of hurting the victim, and he responded that he was at work. When Ms. Brenda Rideau spoke with him on the phone, Mr. Viltz denied he hit Ms. Hardy.

Ms. Sonya Hardy also testified to her daughter's relationship with her children's father, Titus Trimm. She explained that Mr. Trimm had once hit Ms.

Hardy in the head with a telephone and was convicted of domestic abuse battery. Even though Mr. Trimm and Ms. Hardy did not get along, Ms. Sonya Hardy did not believe Mr. Trimm was her daughter's attacker because her daughter "was with [Mr. Viltz]." Both Ms. Sonya Hardy and her mother, Glenda Rideau, recalled hearing broadcasted over the police radio that Ms. Hardy identified Mr. Viltz as her attacker while they were taking care of Ms. Hardy's children at the scene.

The State next called Ms. Hardy's neighbors to testify. Derrick Washington, who lived on Anita Drive, testified that he observed Ms. Hardy and Mr. Viltz arguing outside her residence late in the evening on October 29, 2014. About thirty minutes later, Mr. Washington heard the tires of Mr. Viltz's vehicle screech and then saw Mr. Viltz "drive off fast." Although Mr. Washington was not asked and did not say what time an ambulance arrived, he testified he saw Ms. Hardy come out of the house but could not tell if she had any injuries. He further stated that he had seen no vehicles at the victim's home that night other than Mr. Viltz's vehicle.

Mr. Washington recalled that he had heard the victim "saying, 'Stop, leave me alone,' stuff like that[]" while Mr. Viltz was at her house. And he had seen the victim at the school bus stop with a black eye, which she had attempted to cover with makeup. Mr. Washington had also heard them argue before. After their arguments, Mr. Viltz would leave, driving fast, as if he were angry.

D'Andres Allison lived on Anita Drive with one house between his and Ms. Hardy. He identified Mr. Viltz as Ms. Hardy's boyfriend at trial and stated that he never saw any other males at Ms. Hardy's house. Mr. Allison also observed Ms. Hardy with a black eye. On the night of the attack, Mr. Allison saw the victim, her children, and Mr. Viltz walk into her house. Mr. Viltz left that night, but Mr. Allison did not know when.

Another neighbor, Louis Miles, who lived with his brother Mr. Washington, saw Ms. Hardy with Mr. Viltz outside her residence that evening. He identified Mr. Viltz as Ms. Hardy's boyfriend and had likewise observed Ms. Hardy with a black eye. He too had never seen any other men at her house.

Ms. Hardy's next door neighbor, Amie Dillion, testified that she knew Mr. Viltz was the victim's boyfriend. When asked about the attack, Ms. Dillion recalled that, after midnight, she heard a loud noise that woke her. She looked outside and saw nothing, so she went back to bed. About ten minutes later, she then heard the victim "screaming, 'Help, help.'" Ms. Dillon then went to sleep. When questioned, Ms. Dillion explained that she knew it was Ms. Hardy screaming for help because she heard "them into it all the time." This night was different, however, because she had never heard the victim scream; she said "it made [her] kind of feel weird[.]" She did not get up, though, "[b]ecause [she] kind of [didn't] like to get in nobody else [sic] problem[.]"

Ms. Dillon also recalled seeing Mr. Trimm at the victim's house "once, twice, a few times." But she explained that Mr. Viltz was there every night. Ms. Dillon also saw Ms. Hardy with a black eye about two weeks prior to the attack and had seen Mr. Viltz at the victim's house when that happened.

Mr. Trimm testified regarding an altercation he had with the victim in Morgan City for which he pled guilty to domestic abuse battery, but he did not recall the date. He was questioned about another incident that had taken place in front of the victim's home on Anita Drive in May 2012, for which he pled guilty to simple criminal damage to property. A police report of that incident said Mr. Trimm grabbed the victim around the neck, but he denied that at trial. Officer David Bray

also testified regarding the incident. Shortly after the incident, Mr. Trimm and Ms. Hardy broke up.

Although he did go to the victim's house on Anita Drive to visit the children, Mr. Trimm explained that he did not go there at night and never stayed the night. Ms. Hardy had told him she was dating Mr. Viltz.

Mr. Trimm testified that he spoke to Ms. Hardy on October 29, 2014, when she called him at work "to bring [his] kids to go trick-or-treat." He told her he would not take them because he was tired; he did not see Ms. Hardy or his children that day. Mr. Trimm's time card from his employer showed he was at work from 6:56 a.m. to 7:08 p.m. that day. Thereafter, he picked up the woman with whom he lived, Brittany Trent, from her workplace, and they went home for the evening. He left home the next morning to go to work.

The day before Ms. Hardy died, Mr. Trimm visited her in the hospital with the victim's aunt, Joan Johnson. He also visited her again the day she died. Mr. Trimm gave police a recorded statement, and police confirmed his whereabouts on the night of October 29 with Ms. Trent. Ms. Trent's testimony corroborated Mr. Trimm's memory of that night. When asked if he killed the victim, Mr. Trimm responded, "I wouldn't dare kill her." Mr. Trimm testified he loved the victim "[t]o pieces" as the mother of his children.

Ms. Johnson testified that Mr. Viltz was the last person her niece dated and that she thought Mr. Viltz had injured the victim "[b]ecause he was abusive to her." She too had "seen more than one black eye[,]" and testified that the victim had told her Mr. Viltz caused them.

Katelyn Reina was a registered nurse at St. Patrick Hospital when Ms. Hardy arrived at the emergency room at 3:46 a.m. on October 30, 2014. She

testified, and her contemporaneous notes recorded, that Ms. Hardy identified "her boyfriend" as the person who hit her multiple times in the head, but she did not call him by name. Tracie Kyle, the charge nurse in the emergency room beginning at 7:00 a.m. after Ms. Hardy was admitted earlier in the morning, testified that, although Ms. Hardy did not say who hit her, it was clear from conversations Ms. Hardy had with two visitors that "it was somebody who lived with [her]." Chandrea Collins, who worked as a registered nurse in the "medical-surg" unit at St. Patrick Hospital and took care of the victim when she was admitted to the unit, testified that Ms. Hardy told her, "'My boyfriend did this to me.'" Ms. Hardy never called her boyfriend by name though.

Mr. Viltz testified he and Ms. Hardy began seeing each other in September of 2012, but were only "in a relationship for maybe six to seven months," though they did continue to see each other and he continued to help with the children. He explained that in the beginning, their relationship "was smooth . . . like the honeymoon stage." But they began drifting apart around the summer of 2014 when Mr. Trimm got out of jail, and Ms. Hardy's attitude toward Mr. Viltz changed.

Around that time, Mr. Viltz testified that he tried to tell the victim how he and Avelia Blanchard, who Mr. Viltz began dating in the first part of 2014, were getting closer. About a month before the attack, Mr. Viltz had an altercation with Ms. Hardy wherein he hit her and left a bruise on the side of her eye. Ms. Hardy's father and uncle both confronted him about the incident, and he explained how it happened. However, Mr. Viltz disputed the testimony that Ms. Hardy often had black eyes and said "that was a[n] isolated incident that [he thinks] all of them just seen [sic]."

On the evening of the incident, "around 8:30. Maybe around 9:30, going on 10:00 o'clock[,]" Mr. Viltz drove Ms. Hardy and her children home from her grandmother's house. They then began "fussing" about his relationship with Ms. Blanchard and his plans to marry her after Halloween. When Ms. Hardy tried to block the door to stop Mr. Viltz from leaving, he grabbed her and walked out the door. They continued their verbal altercation for several minutes in the yard, after which Mr. Viltz got into his vehicle and left. Mr. Viltz testified he did not beat Ms. Hardy that evening. He did not return to the house, and he disputed the testimony that said he did.

According to his testimony, Mr. Viltz then went to Ms. Blanchard's house, where he frequently stayed, arriving between 11:00 and 11:15 p.m., and laid in bed with Ms. Blanchard, watching television until he fell asleep around 12:30 a.m. He awoke around 5:45 or 6:00 a.m.

On cross-examination, the State questioned Mr. Viltz about his phone records. Those records showed a call from Ms. Blanchard at 2:46 a.m. Mr. Viltz recalled going upstairs to check on the children, and Ms. Blanchard called his phone because she did not know his whereabouts in the house. He called Ms. Blanchard at 4:45 a.m., but he did not remember why. Again, he called at 4:46 a.m. and testified, "I think I had went [sic] in the front room or something." He said they sometimes called each other when they were both in the house.

The records also showed Mr. Viltz called the victim's number at 2:55 and 2:56 a.m.; but he testified, "maybe I dialed it on accident." He also called her at 3:55, 3:58, 4:23, and 4:31 a.m. Mr. Viltz explained, "I was laying on the side of Ms. Avelia [Blanchard] when I – when I think that that happened."

Mr. Viltz also discussed the various phone and text messages he received "asking if [he] did this to [the victim], if [he] did that to [the victim]." He did not think the hospital stay involved anything severe because when he last saw the victim, "she was walking and this and that."

Ms. Blanchard corroborated Mr. Viltz's recollection of the evening on October 29, 2014, explaining that he returned to her home between 11:00 and midnight, after spending the evening with his father. They lay in bed together until around 3:30 or 4:00 a.m. on Thursday, October 30, when Mr. Viltz got up and went to the front room to watch television. Ms. Blanchard testified that she was unaware of the texts and calls he was receiving about Ms. Hardy.

Detective Willie Fontenot testified as to the homicide investigation. He explained:

> Charlie [Hunter, the coroner] advised me that while [the victim] was there, she advised medical staff, as well as the initial officer, that her boyfriend identified as [Mr. Viltz] had struck her with an end table, and he kicked her numerous times in her side which resulted in her injuries, and she later succumbed to her injuries and died as a result.

He then testified about how he had spoken to Ms. Sonya Hardy and Ms. Glendale Rideau, Ms. Hardy's aunt, who told him the same thing. Detective Fontenot obtained an arrest warrant for Mr. Viltz and a search warrant for the victim's residence based on what Ms. Hardy had told her family members.

When Detective Fontenot arrived at the victim's residence around 9:00 p.m. on October 31, 2014, he found a mop and possible blood in the sink as if someone had tried to clean it. Blood droppings were observed throughout the residence. Detective Fontenot testified, "it just like it was a little – there may have

been somewhat of an altercation in that residence." Police collected an end table with blood on the legs.

Family members and neighbors had all indicated to Detective Fontenot that Mr. Viltz was the victim's boyfriend, but they also said the victim had "interaction with her baby's father identified as Titus Trimm. Those were the only two males that [the victim] would talk to."

Mr. Trimm was cooperative when Detective Fontenot spoke with him on Monday after the victim's death. Detective Fontenot wanted to rule out Mr. Trimm as a suspect and was able to confirm Mr. Trimm was at his girlfriend's house at the time of Ms. Hardy's attack. Although he testified to Mr. Trimm's history of domestic abuse with Ms. Hardy, Detective Fontenot had no information to make him think Mr. Trimm had attacked the victim on October 29, 2014.

Dr. Welke, who performed the autopsy on the victim on November 3, 2014, testified that the laceration on the victim's head did not appear to be made with a sharp cutting instrument. Dr. Welke believed "something struck her forehead which caused the skin to break . . . ." He also found skin tears on the forehead and the lip and "a couple of bruises at the base of the skull." Ms. Hardy also had bruises on her legs, scrapes behind her right ear, and bruises and scrapes on the right side of her neck.

Internally, Dr. Welke found "bruises involving the brain" on the under surface of the scalp, blood in the abdomen, and a torn liver. He considered the cause of death to be "multiple blunt force injuries of the head and abdomen" and the manner of death to be homicide. He felt an end table could have caused the injuries to the brain. Either the brain injury or the torn liver could have independently caused the victim's death.

Dr. Welke could not pinpoint when the bruises on the victim's brain occurred other than to say "[s]ometime during life." He could not identify the relative age of the brain bruises, but he felt they were present the entire time the victim was in the hospital. He also could not say whether Ms. Hardy's death at 5:25 p.m. on October 31 was attributable to a liver laceration at the time of the attack without information about the victim's blood pressure prior to going to the hospital.

Based on this evidence, the jury convicted Mr. Viltz of manslaughter. The trial court sentenced Mr. Viltz to thirty years at hard labor, without benefit of parole, probation, or suspension of sentence, with credit for time served.

## III.

## **ERRORS PATENT**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by the court for errors patent on the face of the record. After reviewing the record, we find there is one error patent. The record does not indicate that the trial court advised Mr. Viltz of the prescriptive period for filing post-conviction relief, as required by La.Code Crim.P. art. 930.8. Therefore, we order the trial court to inform Mr. Viltz of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Mr. Viltz within ten days of the rendition of this opinion and to file written proof in the record that Mr. Viltz received the notice. *State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

IV.

## LAW AND DISCUSSION

When a defendant raises issues on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court must first resolve the sufficiency issue. *State v. Hearold*, 603 So.2d 731 (La.1992). This is because, if the entirety of the evidence is insufficient to support the conviction, "the accused must be discharged as to that crime, and any discussion by the court of the trial error issues as to that crime would be pure dicta since those issues are moot." *Id*. at 734. Accordingly, we will first address Mr. Viltz's sufficiency arguments.

### *Sufficiency of Evidence*

In his third assignment of error and second pro se assignment of error, Mr. Viltz asserts that the evidence was insufficient to sustain his conviction for manslaughter.

### *Standard of Review*

This court in *State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371, set forth the analysis for insufficiency of the evidence claims:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the Jackson standard of

review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*Elements of Manslaughter*

Manslaughter is defined in La.R.S. 14:31(A) as:

(1)   A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.   Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or

(2)   A homicide committed, without any intent to cause death or great bodily harm.

(a)   When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person . . . .

The evidence presented against Mr. Viltz was entirely circumstantial. Mr. Viltz denied his guilt and suggested the hypothesis that Mr. Trimm, who had a history of abusing the victim, attacked her and caused her death.   Although Mr. Trimm had an alibi, Mr. Viltz pointed out that the police did not investigate it beyond asking Ms. Trent, who told them Mr. Trimm was with her; nor did the police do anything further to confirm Mr. Trimm's whereabouts.   Nevertheless, the jury rejected the hypothesis that Mr. Trimm caused the victim's death and found Mr. Viltz guilty of manslaughter.

14

As to the evidence in support of the jury's finding of Mr. Viltz's guilt, Ms. Hardy named her attacker and gave detailed information about him to Officer Veillon. Although the jury was not told the name she gave to Officer Veillon, testimony established that her boyfriend caused her injuries and that Mr. Viltz was her boyfriend.

Undisputed testimony, including Mr. Viltz's testimony, established that he was with the victim on the evening before she reported the attack and that they argued around 11:00 p.m. They were together until sometime between 11:00 p.m. and midnight. Ms. Dillon heard a loud noise and the victim screaming for help after midnight, but she could not say what time. Evidence showed that the victim called 911 close to 3:00 a.m. Nothing suggested the time of the attack itself except the victim's comment to the 911 dispatcher that someone had attacked her about thirty minutes prior to her call.

Moreover, the evidence showed that Mr. Viltz and Ms. Hardy had a long-term, troubled relationship. The victim did not see any men other than Mr. Viltz after she ended her relationship with Mr. Trimm. Witnesses further testified that they argued frequently, and the victim had multiple black eyes that the witnesses believed were caused by Mr. Viltz. Further, no one offered any evidence to dispute the testimony of Mr. Trimm and Ms. Trent that they were together all evening.

In contrast, however, the evidence also showed that Ms. Hardy told the 911 dispatcher and Officer Veillon, when he arrived at the scene, that she did not know who attacked her. She seemed intoxicated at her house and disoriented at the hospital. Although the evidence revealed that Ms. Hardy had fallen from her bed at the hospital, no one testified whether she could have received injuries from that fall.

15

Moreover, the evidence was consistent that Mr. Viltz was not at the victim's house for almost three hours before she made the 911 call seeking help.

Given this contradictory evidence, the jury clearly had to make credibility determinations, and their determinations were obviously adverse to Mr. Viltz. Based on the record before us, we find the evidence sufficiently establishes a jury could reasonably find Mr. Viltz committed a homicide "in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." La.R.S. 14:31(A)(1). Likewise, a reasonable jury could also find Mr. Viltz did not intend to kill the victim, but her death resulted from the battery he inflicted on her. Accordingly, after viewing the evidence in the light most favorable to the prosecution, we find the State has satisfied its burden of proving the elements of the crime of manslaughter beyond a reasonable doubt, and this assignment lacks merit.

*Confrontation Clause*

Mr. Viltz next claims his Sixth Amendment rights were violated because State witnesses testified about the victim's out-of-court statements that were testimonial in nature. He argues that allowing the testimony violated the federal constitution's Confrontation Clause. Therefore, he asserts that his conviction should be vacated, and he should receive a new trial.

Testimonial statements are admissible only when the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 59, 124 S.Ct. 1354, 1369 (2004). The victim here is considered unavailable because of her death. La.Code Evid. art.

16

804(A)(4).  Unfortunately, no one had any prior opportunity to cross-examine her.

Therefore, any testimonial statements made by her are inadmissible.

Significantly, Mr. Viltz made no objection when Ms. Kaitlyn Reina,

Ms. Glenda Rideau, Ms. Sonya Hardy, Ms. Chandrea Collins, Ms. Brenda Rideau,

Detective Fontenot, and Ms. Joan Johnson testified to evidence he now claims was

admitted in violation of his constitutional rights.  The contemporaneous objection

rule of La.Code Crim.P. art. 841 applies to alleged violations of the Confrontation

Clause.  Arguably, Mr. Viltz may not now raise the issue on appeal regarding these

witnesses, and he is not entitled to a "plain error" review of the admissibility of this

testimony.  *State v. Vallo*, 13-1369 (La. 1/10/14), 131 So.3d 835.  Regardless,

however, we find the statements to which Mr. Viltz objects are either not prohibited

testimonial evidence or their admission was harmless error.

*Prohibited Testimonial Evidence*

In *Ohio v. Clark*, __ U.S. __, 135 S.Ct. 2173 (2015), the Supreme Court

found the testimony of a witness did not constitute prohibited testimonial evidence

based on the context in which the challenged statements were made.  The *Clark*

defendant was caring for his girlfriend's children.  A teacher discovered marks on

the three-year-old son, who identified the defendant as his abuser.  The child was

unavailable to testify because of his age and not subject to cross-examination.  The

Supreme Court held his statements did not implicate the Confrontation Clause

because neither he nor his teachers "had the primary purpose of assisting in [the

defendant's] prosecution[.]"  *Id*. at 2181.  The child had "never hinted that he

intended his statements to be used by the police or prosecutors." *Id.* The Court noted:

> although we decline to adopt a rule that statements to individuals who are not law enforcement officers are categorically outside the Sixth Amendment, the fact that L.P. was speaking to his teachers remains highly relevant. Courts must evaluate challenged statements in context, and part of that context is the questioner's identity. Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers.

*Id*. at 2182 (citations omitted).

Similarly, the testimony of some of the witnesses of which Mr. Viltz complains does not constitute prohibited testimonial evidence. Sonya Hardy's testimony that the victim once told her Mr. Viltz had given her a black eye involved a personal conversation between the victim and her mother, not any potential prosecution of criminal activity. Therefore, we find this conversation and any statements made therein do not relate to any prosecution of Mr. Viltz.

Likewise, Brenda Rideau's testimony involved a personal conversation with the victim, who was her niece, in which she asked the victim if "he" had hit the victim. When Brenda mentioned Mr. Viltz's name and said he was "wrong for that," the victim responded, "He a pussy." Brenda concluded from that conversation that Mr. Viltz was the attacker. We find this discussion likewise does not involve any testimonial statement related to any prosecution of Mr. Viltz.

Joan Johnson, the victim's aunt, testified that she had seen the victim with "more than one black eye." She told the jury that the victim had told her that Mr. Viltz had caused them. This personal conversation between the victim and her

aunt about another incident, we find, is not testimonial evidence regarding the attack that led to the victim's death.

Kaitlyn Reina, the emergency room nurse, testified the victim said her boyfriend hit her "upside the head a couple of times." Medical records relating the victim's statement were admitted into evidence as Exhibit S-3.

In *State v. Koederitz*, 14-1526 (La. 3/17/15), 166 So.3d 981, the supreme court found a witness's testimony was not prohibited testimonial evidence because the challenged statements were relevant and pertinent to the medical treatment of the victim and were not procured as an out-of-court substitute for trial testimony. Therein, the victim of domestic violence identified the defendant, her boyfriend, as her attacker to emergency room personnel. This identification was included in the victim's medical records. The Louisiana Supreme Court stated:

> We recognize, as Judge Lobrano concluded, that La.C.E. art. 803(4), like its federal counterpart in Fed.R.Evid. 803(4), may encompass other instances in which the identity of a perpetrator plays an integral role in medical treatment and diagnosis in connection with that treatment. *See*, *e.g.*, *United States v. Joe*, 8 F.3d 1488, 1494-95 (10th Cir.1993) (Although "a declarant's statement relating the *identity* of the person allegedly responsible for her injuries is not ordinarily admissible under Rule 803(4) because statements of identity are not normally thought necessary to promote effective treatment . . . . The identity of the abuser is reasonably pertinent to treatment in virtually every domestic sexual assault case, even those not involving children . . . . The physician generally must know who the abuser was in order to render proper treatment because the physician . . . . may recommend special therapy or counseling and instruct the victim to remove herself from the dangerous environment by leaving the home and seeking shelter elsewhere.") (citations omitted).

> Given evolving jurisprudence and in accord with other courts, any contrary expression in [*State v.*] *Baldwin*[, 96-1660 (La. 12/12/97), 705 So.2d 1076, *cert. denied*, 525 U.S. 831, 119 S.Ct. 84 (1998),]

19

notwithstanding, we see no principled basis for confining statements of fault under La.C.E. art. 803(4) solely to cases involving domestic sexual assault, whether of adults or children, as opposed to other instances of physical assault and abuse taking place in a context that may be fairly described in terms of domestic violence. *See*, *e.g.*, *Moore v. City of Leeds*, 1 So.3d 145, 150 (Ala.Crim.App.2008) (rationale for admitting statements of identity by a minor receiving treatment for sexual abuse "would also apply to victims of domestic violence."); *State v. Williams*, 137 Wash.App. 736, 154 P.3d 322, 328 (2007) ("Generally, statements of fault are inadmissible, but much, of course, depends on the context in which such statement are made. In domestic violence and sexual abuse situations, a declarant's statement disclosing the identity of a closely-related perpetrator is admissible under [Evidence Rule] 803(a)(4) because part of reasonable treatment and therapy is to prevent recurrence and future injury.") (internal quotation marks and citations omitted); *Oldman v. State*, 998 P.2d 957, 961–62 (Wyo.2000) ("Identity rarely is germane to the promotion of treatment or diagnosis, but we, as well as other courts, have recognized that such statements can be relevant to treatment in instances of child abuse . . . . There is no logical reason for not applying this rationale to non-sexual, traumatic abuse within a family or household, since sexual abuse is simply a particular kind of physical abuse.") (citations omitted).

. . . .

The trial court therefore erred in excluding the hospital records documenting the victim's initial treatment at Ochsner Hospital on February 23, 2013, during which she identified her assailant and placed the incident in the context of domestic violence, and the follow-up visit with Dr. Anderson on February 25, 2013, during which the victim elaborated on her prior statements and received counseling on ways to change her behavior even as she insisted that she would not report the incident to the police. These statements are non-hearsay as a matter of La.C.Cr.P. art. 803(4) and are therefore admissible as substantive evidence because they were made for purposes of diagnosis and treatment, essential components under current medical practice in cases of domestic violence, and not as part of a forensic examination intended for use at trial. . . .

> The statements at issue in the present case are also non-testimonial for purposes of the Sixth Amendment Confrontation Clause because they were not "procured for the *primary purpose* of creating an out-of-court substitute for trial testimony." *Michigan v. Bryant*, 562 U.S. 344, 392, 131 S.Ct. 1143, 1155, 179 L.Ed.2d 93 (2011) (emphasis added)[.]

*Id*. at 985-86. Notably, in *Koederitz*, the victim, after initially being seen in the emergency room, had a follow-up appointment with a psychiatrist. Unfortunately, in the instant case, the victim died within two days of being attacked.

At the time Ms. Reina made her medical record, the victim was still alive. Her statement identifying "her boyfriend" as her attacker was not procured as an out-of-court substitute for trial testimony. It was an important part of her medical treatment and important to her safety because, like the victim in *Koederitz*, she was a victim of domestic abuse. We find that Ms. Reina's testimony merely reflected the information set out in those properly-admitted records.

Chandrea Collins cared for Ms. Hardy in the medical-surgical unit after she was admitted to the hospital from the emergency room. Ms. Collins's job was to fully assess her patient. While getting the history of the victim's injuries, she asked the victim what happened. Ms. Hardy said her boyfriend attacked her. This entire exchange was done from a medical standpoint, not to find a defendant to prosecute. This exchange, we find, was merely part of the victim's medical care and treatment.

Similarly, Tracie Kyle, the emergency room charge nurse, interacted with the victim and two ladies, identified through other testimony as Brenda and Glendale Rideau. A conversation about what happened to the victim included and involved all of them—Ms. Kyle, the victim, Brenda, and Glendale. As with the

testimony of the other nurses, we find this conversation was grounded in medical purposes and safety reasons, not for prosecution of Mr. Viltz.

*Harmless Error*

Detective Fontenot testified that the coroner, Charles Hunter, told him the victim advised medical staff and an officer that Mr. Viltz had attacked her. He also testified Glendale Rideau told him the victim had identified Mr. Viltz. While this testimony may be considered testimonial because it was told to the jury by someone specifically trying to identify Mr. Viltz's criminal behavior, we nevertheless find its admission was harmless error as shown below.

Glenda Rideau and Sonya Hardy also testified they overheard a police radio transmission about the victim's identification of Mr. Viltz. Admittedly, this testimony was clearly hearsay evidence offered to prove the truth of Mr. Viltz's guilt. Further, the purported source of the evidence was Ms. Hardy herself, who of course was not available for confrontation and cross-examination.

Ms. Hardy, however, had offered her statement identifying Mr. Viltz as her attacker as part of her narrative to medical personnel about what had happened to her. Based on the record, no one suspected at that time the victim would die of her injuries. The identity of her attacker was important to her safety, to the safety of others at the hospital, and to her medical treatment. This information was properly admitted at trial as part of her medical records. *See Koederitz*, 166 So.3d 981. Thus, we find the testimony of Glenda Rideau and Sonya Hardy about what they overheard on the police radio was cumulative of those medical records, and its admission was, therefore, harmless error.

> Confrontation errors are subject to a harmless error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 106

22

S.Ct. 1431, 89 L.Ed.2d 674 (1986). The correct inquiry is whether the reviewing court, assuming that the damaging potential of the cross-examination were fully realized, is nonetheless convinced that the error was harmless beyond a reasonable doubt. *Id.* at 684, 106 S.Ct. 1431. Factors to be considered by the reviewing court include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contracting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.* at 684, 106 S.Ct. 1431; *State v. Wille*, 559 So.2d at 1332. The verdict may stand if the reviewing court determines that the guilty verdict rendered in the particular trial is surely unattributable to the error. *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).

*State v. Broadway*, 96-2659, p. 24 (La. 10/19/99), 753 So.2d 801, 817, *cert. denied*, 529 U.S. 1056, 120 S.Ct. 1562 (2000).

Under the *Van Arsdall/Broadway* factors, the testimony of Detective Fontenot, Glenda Rideau, and Sonya Hardy was cumulative in nature and was corroborated by other testimony. The medical records positively identified the victim's boyfriend as her attacker. Numerous witnesses identified Mr. Viltz as her boyfriend. A number of witnesses testified they saw the victim with black eyes; they knew the victim was in a relationship with a man; they suspected the man had caused her black eyes; she had been in a fight with a man; and the injuries resulting from that fight led to her emergency room visit. Mr. Viltz cross-examined witnesses without objection from the State. As discussed above, while the State's case was based on circumstantial evidence, the evidence was sufficiently strong to establish Mr. Viltz's guilt beyond a reasonable doubt.

Therefore, we find Mr. Viltz's Confrontation Clause rights were not violated by the introduction of the victim's out-of-court statements into evidence. With the possible exception of the testimony of Detective Fontenot, Ms. Rideau, and

Ms. Sonya Hardy, the admission of which was harmless error, the testimony of which Mr. Viltz complains was not testimonial and did not implicate the Confrontation Clause.

Defendant's pro se brief argues the victim's accusatory statements "made to the officer during inquiry, while victim was experiencing the adverse effect of ingestion of illegal drugs as to subliminal hallucinations[,]" should have been suppressed and considered hearsay. The failure to do so, he contends, resulted in a violation of his right to confront and cross-examine the victim.

However, the record does not show Ms. Hardy was under the effect of illegal drugs. Ms. Collins testified the victim's urinalysis report showed only a trace of methamphetamine, which some over-the-counter medications contain. As the record fails to show the premise upon which Mr. Viltz makes his claim for a Confrontation Clause violation, we find this assignment is also meritless.

### *Ineffective Assistance of Counsel*

In his second assignment of error and third pro se assignment, Mr. Viltz argues his Sixth Amendment rights were violated and he was denied a fair trial because of ineffectiveness of counsel. Specifically, Mr. Viltz complains of the unobjected to admission of the alleged hearsay testimony discussed above as well as his counsel's opening statement and failure to cross-examine witnesses.

### *Legal Standard for Ineffective Assistance of Counsel*

Our supreme court set forth the legal standard for such constitutional challenges, explaining:

> A criminal defendant is guaranteed the effective assistance of counsel. United States Sixth Amendment; La. Const. art. I, § 13; *Strickland v. Washington*, 466 U.S.

24

668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Washington*, 491 So.2d 1337 (La.1986). To establish a claim of ineffective assistance, a defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and, that counsel's professional errors resulted in prejudice to the extent that it undermined the functioning of the adversarial process and rendered the verdict suspect. *Strickland v. Washington*, *supra*; *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). This does not mean "errorless counsel [or] counsel judged ineffective by hindsight, but counsel reasonably likely to render effective assistance." *State v. Ratcliff*, 416 So.2d 528, 531 (La.1982).

A claim of ineffectiveness is generally relegated to post-conviction, unless the record permits definitive resolution on appeal. *E.g.*, *State v. Prudholm*, 446 So.2d 729 (La.1984). However, when the record is sufficient for review, this Court will reach the merits of complaints about counsel's performance and grant relief when appropriate. *E.g.*, *State v. Hamilton*, 92-2639 (La.7/1/97), 699 So.2d 29, 32-35.

*State v. Bright*, 98-398, pp. 40-41 (La. 4/11/00), 776 So.2d 1134, 1157, *reversed on other grounds*, 02-2793, 03-2796 (La. 5/25/04), 875 So.2d 37.

To succeed on this assignment, Mr. Viltz must first show counsel's performance was deficient and, next, that the deficiency prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689.

Having found the record here is sufficient to determine the issues of whether counsel was ineffective and whether that ineffectiveness resulted in prejudice to Mr. Viltz, we turn now to his arguments.

*Hearsay*

"'Hearsay' is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La.Code Evid. art. 801(C). As discussed above, the medical records established that Ms. Hardy said her boyfriend attacked her; the statement in those records, however, is an exception to the hearsay rule. La.Code Evid. art. 803(4). Other evidence established Mr. Viltz was the victim's boyfriend. Thus, admissible, non-hearsay evidence showed Mr. Viltz, the victim's boyfriend, attacked her. The other potentially hearsay evidence was cumulative of this non-hearsay evidence and, therefore, harmless. *State v. King*, 17-126 (La.App. 4 Cir. 10/27/17), 231 So.3d 110. No prejudice results from harmless error. *State v. Truehill*, 09-1546, p. 15 (La.App. 3 Cir. 6/2/10), 38 So.3d 1246, 1256.

Without prejudice, Mr. Viltz cannot sustain a claim of ineffective assistance of counsel. As discussed above, only one possible Confrontation Clause violation occurred, and we found that possible violation was harmless error. Therefore, Mr. Viltz has shown no prejudice resulting from Confrontation Clause violations regarding the testimony of those witnesses.

*Opening Statement*

Mr. Viltz also complains of his counsel's opening statement. He contends the statement representing "only one page or less of transcript" basically said only that Mr. Viltz "would listen to the State's case just as the jury would." However, Mr. Viltz does not indicate what he would have wanted his counsel to argue. Defense counsel did tell the jury the State's case would be like a puzzle with "many missing pieces . . . [and] huge gaps that [the jury] need[s] to watch for." He

26

correctly identified the issue to be proven, i.e., whether Mr. Viltz was the person who beat the victim. He asked the jury to hold the State to the "very detailed timeline" the State said it would present. Though short and inelegantly articulated, defense counsel's opening statement raised the proper issue and advised the jury of Mr. Viltz's perceived problem with the State's case against him. Therefore, we find that Mr. Viltz has shown no prejudice resulting from this opening statement.

*Cross-examination*

Defense counsel, according to Mr. Viltz, did not sufficiently cross-examine "nearly every witness[.]" Mr. Viltz contends witnesses "were routinely questioned in such as a [sic] way as to allow them to essentially retell the alleged victim's story a second time and us[e] all of the unconstitutional hearsay that should have been objected to by defense counsel and/or excluded by the trial court." As an example, Mr. Viltz's brief uses the cross-examination of Glenda Rideau to show how counsel's questions allowed her to again testify she heard police identify Mr. Viltz as the attacker from the police radio. Counsel specifically asked, "Now, did you – did you say you heard some police say that Mario did it?" Ms. Glenda responded, "It came over the police radio." Counsel, during the same exchange, again reiterated that point by asking Ms. Glenda if she knew what policeman said it and confirmed she heard over the radio that police had confirmed Mr. Viltz "did it."

The cross-examination of the State's witnesses was not a paradigm of legal excellence. However, Mr. Viltz fails to identify what his counsel should have asked in cross-examination. Other evidence established that the victim was beaten by her boyfriend and that her boyfriend was Mr. Viltz. Ms. Glenda's testimony that she heard Mr. Viltz's name over the radio was cumulative of other evidence that, when considered together, established Mr. Viltz's guilt. Thus, we find Mr. Viltz was

27

not prejudiced by the introduction of this cumulative evidence, and this assignment of error is without merit.

*Excessive Sentence*

In his final assignment of error, Mr. Viltz contends that his thirty-year sentence is excessive and that the trial court erroneously considered only the factors of his criminal history and the victim's vulnerability. Though Mr. Viltz objected to the sentence when the trial court imposed it, he did not file a motion to reconsider it.

Louisiana Code of Criminal Procedure Article 881.1(E) requires a defendant to make or file a motion to reconsider his sentence within thirty days of imposition of the sentence. A defendant who fails to make or file such a motion is precluded from raising any objection to the sentence on appeal. *State v. White*, 03-1535 (La.App. 3 Cir. 4/28/04), 872 So.2d 588; *State v. Prudhomme*, 02-511 (La.App. 3 Cir. 10/30/02), 829 So.2d 1166, *writ denied*, 02-3230 (La. 10/10/03), 855 So.2d 324. Likewise, a defendant who fails to raise the issue of the trial court's failure to consider the factors of La.Code Crim.P. art. 894.1 in the trial court cannot raise it for the first time on appeal. *State v. Hebert*, 08-542 (La.App. 3 Cir. 11/5/08), 996 So.2d 688.

Even so, this court has reviewed claims of excessiveness where the defendant made no objection and did not file a motion to reconsider his sentence. *See State v. Johnlouis*, 09-235 (La.App. 3 Cir. 11/4/09), 22 So.3d 1150, *writ denied*, 10-97 (La. 6/25/10), 38 So.3d 336, *cert. denied*, 562 U.S. 1150, 131 S.Ct. 932 (2011). Accordingly, we will review Mr. Viltz's assignment of error as a bare claim of excessiveness. *State v. Baker*, 08-54 (La.App. 3 Cir. 5/7/08), 986 So.2d 682.

This court has previously discussed the standard for reviewing excessive sentence claims:

> [Louisiana Constitution Article] I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.

*State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331 (citations omitted).

Mr. Viltz was exposed to a sentence of up to forty years for his conviction for manslaughter. La.R.S. 14:31. The trial court sentenced him to thirty years at hard labor, with credit for time served. Thus, he received a sentence of ten years above the midrange but ten years less than the maximum possible term.

During sentencing, Mr. Viltz's father addressed the court and claimed Mr. Viltz was innocent and would never hurt the victim or any other woman. Defense counsel asked for "a minimal sentence[.]" Additionally, a number of Mr. Viltz's friends and relatives and the mother of his child wrote letters to the trial court claiming he was a good person and asking for leniency in his sentencing. In contrast, Ms. Hardy's mother and aunt wrote the court requesting Mr. Viltz be sentenced to the maximum term of forty years.

The trial judge ordered a presentence investigation report but did not review its contents at the sentencing hearing. He indicated he had reviewed the

sentencing guidelines of La.Code Crim.P. art. 894.1. He noted Mr. Viltz was not a convicted felon and had only "a few random possession charges here and there[.]" Defendant had no history of violence. Nevertheless, "this was a violent encounter" for a "completely vulnerable" victim who "had no way to protect herself or help herself."

Considering other sentencing factors enumerated in La.Code Crim.P. art. 894.1, the record indicates Mr. Viltz used the table as a dangerous weapon to beat the victim. The record does not reveal any mitigating circumstances other than the lack of a criminal record. The nature of the offense was a violent attack that led to the victim's death. Evidence in the record indicates Mr. Viltz left the injured victim at her home without summoning any help for her. Mr. Viltz had a long-term relationship with Ms. Hardy, and evidence showed he had harmed her in the past.

Based on the facts as shown by the evidence in this case, we find Mr. Viltz's thirty-year sentence is not excessive.

V.

## CONCLUSION

For the foregoing reasons, we affirm Mr. Viltz's conviction and sentence. We further direct the trial court to inform Mr. Viltz of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Mr. Viltz within ten days of the rendition of this opinion and to file written proof in the record that Mr. Viltz received the notice.

**AFFIRMED.**