[No. 34246-4-II.   Division Two.   March 27, 2007.]

THE STATE OF WASHINGTON, *Respondent*, v. MICHAEL WAYNE WILLIAMS, *Appellant*.

738

*Sheri L. Arnold,* for appellant.

*Gerald A. Horne, Prosecuting Attorney,* and *Kathleen Proctor, Deputy,* for respondent.

¶1 Van Deren, J. — Michael Wayne Williams appeals his convictions for first degree burglary, first degree kidnapping, second degree assault, three counts of first degree rape, felony harassment, intimidating a witness, and second degree possession of stolen property. He argues that the trial court violated his Sixth Amendment[1] right to confront witnesses by admitting hearsay statements under the medical treatment[2] and excited utterance[3] exceptions to

---

[1] In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel in his defense.

U.S. Const. amend. VI.

[2] Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

ER 803(a)(4).

[3] "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." ER 803(a)(2).

the hearsay rules and in permitting a witness to refresh her memory by reading her notes, contrary to Evidence Rule (ER) 612. He also challenges his convictions on numerous bases in his statement of additional grounds.[4] We affirm.

## FACTS

¶2 On September 28, 2003, police responded to a report that a woman had been kidnapped and assaulted the previous night. Officer Brian Byerley met the 18-year-old victim, J.A.D.; the victim's mother, L.L.D.; J.A.D.'s friend, Christina Taylor; Sharon Taylor, Christina's mother; and a neighbor at Sharon Taylor's house.[5]

¶3 J.A.D. told Byerley that her mother's former boyfriend, Michael Williams, had kidnapped and raped her.[6] The responding police officers observed that J.A.D. "had bruising on her forehead, both eyes, and both arms." Clerk's Papers (CP) at 4. Detective Dana Powers-Hubbard took J.A.D. to Tacoma General Hospital for examination. J.A.D. made a recorded statement for Powers-Hubbard at the hospital.

¶4 During J.A.D.'s medical examination at Tacoma General Hospital, Teri Jacobsen, a forensic nurse, collected vaginal and anal swabs for DNA (deoxyribonucleic acid) testing. The DNA gathered was found to be a match with Williams's. Jacobsen interviewed J.A.D. using a history

---

[4]
A defendant/appellant in a review of a criminal case may file a pro se statement of additional grounds for review to identify and discuss those matters which the defendant/appellant believes have not been adequately addressed by the brief filed by the defendant/appellant's counsel.
RAP 10.10(a).

[5] We refer to the victim and her mother by their initials. We refer to Christina and Sharon Taylor by their first names for clarity. We intend no disrespect.

[6] Williams was the father of J.A.D.'s three-year-old half sister, but he moved out of L.L.D.'s residence in May 2003. During the following months, L.L.D. told Williams several times that he was no longer welcome to come over unannounced.

questionnaire that included a series of questions about the rapes. Jacobsen also took verbatim notes during J.A.D.'s general narrative about what had transpired. At trial, Jacobsen testified about J.A.D.'s answers to the questions on the history questionnaire and read her notes on J.A.D.'s general narrative.

¶5 According to the police report and investigation, on September 28 around 4:00 AM, Williams broke into L.L.D.'s house in Bonney Lake and attacked J.A.D., who was asleep in her bedroom. Williams, who was wearing surgical gloves, jumped on top of J.A.D., choked her, and dragged her out of the house using a head-lock hold. He placed her in the trunk of his car. While in the trunk, J.A.D. "pulled hair out of her head to leave behind" and "tried to pull the wires out of the tail lights." CP at 4. Williams drove to a house in DuPont, where he pulled into the garage. There, he opened the trunk, secured her hands with duct tape, and used the tape to cover her eyes and mouth. He took her to a bedroom where he raped her.

¶6 Williams kept asking about her mother's new boyfriend, Tracy Dunivan, during the rape. He asked where Dunivan lived and J.A.D. told him where his house was and that she could take Williams there. Williams left the bedroom for 5 to 10 minutes to verify the information J.A.D. had given him, returned, and raped her again. He asked her to take him to Dunivan's house and removed the duct tape from her face. He left the used duct tape on the bedroom floor. After Williams had driven to Dunivan's house, he wrote down the address and used a box cutter to cut the duct tape from J.A.D.'s hands. He took her back to the DuPont house and raped her for a third time. Williams drove J.A.D. home, after threatening to "pick off her family one by one" if she told anyone. CP at 4.

¶7 J.A.D. said that after Williams dropped her off, she immediately washed her hair in the shower, but, realizing that this might be a mistake, left the shower and changed into a new set of clothes. She decided to walk to her friend Christina Taylor's home. She left her house for Taylor's

within 20 minutes after being dropped off by Williams, taking her cell phone and a disposable camera with her. She walked through ditches on her way, hoping that Williams would not see her if he drove by. J.A.D. stated, "If he drove by, I didn't want him to know I was going somewhere." Report of Proceedings (RP) at 98. She arrived at the Taylors' house around 7:00 AM. On her way, J.A.D. telephoned Sharon, but Sharon could not understand what J.A.D. was saying because she was hysterical and crying. When she arrived at the Taylors', J.A.D. told them about the rapes. J.A.D. was shaking badly, and Sharon and Christina testified at trial that J.A.D.'s face was swollen and red and her wrists had duct tape marks. Sharon called L.L.D. and then the police.

¶8 Later that day, police arrested Williams during a traffic stop in DuPont and found the duct tape and latex gloves at the DuPont residence. The State charged Williams with first degree burglary, first degree kidnapping, second degree assault, and three counts of first degree rape.[7]

¶9 At trial, Williams's testimony differed markedly from what J.A.D. had reported to the police and the forensic nurse. According to Williams, he was checking on his three-year-old daughter at 4:00 AM because L.L.D. did not answer her telephone. He testified that he pounded on the door and that J.A.D. answered it and told him that his daughter was with L.L.D. at Tracy Dunivan's house. J.A.D. agreed to show him where Tracy Dunivan lived. During the trip to Dunivan's, Williams realized that L.L.D. had a new boyfriend, which devastated him. They decided to swing by Williams's house as they drove by DuPont. They went to his bedroom and he sat on the bed while he checked Dunivan's telephone number using the reverse phone directory. When he stood up from the bed, he gave J.A.D. a hug and she turned toward him and kissed him. Williams said that they then had consensual sex involving bondage with the duct

---

[7] On August 17, 2004, the State amended the information to include felony harassment, intimidating a witness, and second degree possession of stolen property.

tape because J.A.D. had a bondage fantasy. When they returned to J.A.D.'s home, Williams got angry about something J.A.D. said and hit her across the face.

¶10 The jury found Williams guilty on all counts, and the trial court sentenced him within the standard range. Williams appeals.

## ANALYSIS

¶11 Williams argues that the trial court violated his right to confront witnesses under the Sixth Amendment and *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), and that it abused its discretion by making numerous evidentiary errors.

### I. STANDARD OF REVIEW

¶12 We review a trial court's evidentiary rulings for an abuse of discretion. *State v. Finch*, 137 Wn.2d 792, 810, 975 P.2d 967 (1999). A court abuses its discretion when its evidentiary ruling is " 'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.' " *State v. Downing*, 151 Wn.2d 265, 272, 87 P.3d 1169 (2004) (quoting *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)). The burden is on the appellant to prove an abuse of discretion. *State v. Hentz*, 32 Wn. App. 186, 190, 647 P.2d 39 (1982), *rev'd on other grounds*, 99 Wn.2d 538, 663 P.2d 476 (1983). We may uphold a trial court's evidentiary ruling on the grounds the trial court used or on other proper grounds the record supports. *State v. Powell*, 126 Wn.2d 244, 259, 893 P.2d 615 (1995).

¶13 The standard used to determine if the evidence supports a criminal verdict is whether " 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (emphasis omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). Generally, it is the role

of the trier of fact, not the appellate court, to resolve conflicts in the testimony and to evaluate the credibility of witnesses and the persuasiveness of material evidence. *State v. Carver*, 113 Wn.2d 591, 604, 781 P.2d 1308, 789 P.2d 306 (1989).

## II. JACOBSEN'S TESTIMONY

### A. Confrontation Clause

¶14 Williams contends that the trial court violated his right of confrontation by allowing Jacobsen to testify about J.A.D.'s answers to the history questionnaire. He argues that J.A.D.'s statements to Jacobsen were inadmissible under *Crawford* because the State did not elicit the testimony directly from J.A.D. when she testified. Relying on *State v. Rohrich*, 132 Wn.2d 472, 939 P.2d 697 (1997), he asserts that the confrontation clause requires the hearsay declarant to testify about the alleged events.

¶15 The Sixth Amendment's confrontation clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The United States Supreme Court has held that this bedrock procedural guaranty applies to both federal and state prosecutions. *Crawford*, 541 U.S. at 42. "Significantly, prior statements must be excluded under the *Crawford* rule only if a witness is unavailable at trial for purposes of the confrontation clause." *State v. Price*, 158 Wn.2d 630, 639, 146 P.3d 1183 (2006).

¶16 In *Rohrich*, the State did not question the child witness about the alleged acts, thereby preventing the defendant from cross-examining her. 132 Wn.2d at 474. Thus, the defendant was convicted solely on the basis of hearsay statements the child witness had made to others. *Rohrich*, 132 Wn.2d at 475. Our Supreme Court reversed, holding,

> The opportunity to cross-examine means more than affording the defendant the opportunity to hail the witness to court for examination. It requires the State to elicit the damaging testimony from the witness so the defendant may cross-examine if he so chooses. . . . The State's failure to adequately draw out testimony from the child witness before admitting the child's hearsay puts the defendant in "a constitutionally impermissible Catch-22" of calling the child for direct or waiving his confrontation rights.

*Rohrich*, 132 Wn.2d at 478 (footnotes and citations omitted) (quoting *Lowery v. Collins*, 996 F.2d 770, 771-72 (5th Cir. 1993)).

¶17 But, as Williams correctly points out, our Supreme Court stated in *State v. Clark* that "the admission of hearsay statements will not violate the confrontation clause if the hearsay declarant is a witness at trial, is asked about the event and the hearsay statement, and the defendant is provided an opportunity for full cross-examination." 139 Wn.2d 152, 159, 985 P.2d 377 (1999). And that is what happened here. At trial, J.A.D. testified extensively about how Williams had raped her, which was what her statements to Jacobsen were mostly about, and replied on cross-examination that she understood the purpose of her trip to the hospital was to "gather evidence." RP at 114-15. Thus, unlike *Rohrich*, the State did not avoid asking J.A.D. about the alleged acts, nor did it prevent Williams from a full cross-examination of her. Accordingly, Williams's claim that his right to confront J.A.D. under the Sixth Amendment fails.

### B. ER 803(a)(4)

¶18 Williams also contends that the trial court abused its discretion by admitting J.A.D.'s answers to Jacobsen's questionnaire under the medical diagnosis exception to the hearsay rule, ER 803(a)(4). According to Williams, J.A.D.'s statements to Jacobsen were inadmissible because J.A.D. testified that she went to the hospital so that evidence could be gathered and that she did not feel she needed specific medical treatment. He argues that, according to J.A.D.'s

testimony, her statements were not made for purposes of medical diagnosis or treatment as ER 803(a)(4) requires. Without citing to authority, he asserts that "[t]he critical inquiry is not whether the interviewer might refer the subject to someone else for diagnosis or treatment, but whether the subject made the statements 'for the purposes of medical diagnosis or treatment.'" Br. of Appellant at 21.

¶19 Williams' contention lacks merit. The medical diagnosis exception applies only to statements that are "reasonably pertinent to diagnosis or treatment." ER 803(a)(4). A party demonstrates a statement to be reasonably pertinent when (1) the declarant's motive in making the statement is to promote treatment and (2) the medical professional reasonably relied on the statement for purposes of treatment. *State v. Butler*, 53 Wn. App. 214, 220, 766 P.2d 505 (1989).

¶20 Generally, statements of fault are inadmissible, but "[m]uch, of course, depends on the context in which such statements are made." *In re Dependency of Penelope B.*, 104 Wn.2d 643, 656, 709 P.2d 1185 (1985). In domestic violence and sexual abuse situations, a declarant's statement disclosing the identity of a closely-related perpetrator is admissible under ER 803(a)(4) because part of reasonable treatment and therapy is to prevent recurrence and future injury. *State v. Ackerman*, 90 Wn. App. 477, 482, 953 P.2d 816 (1998); *State v. Sims*, 77 Wn. App. 236, 239, 890 P.2d 521 (1995).

¶21 Here, the statements were admissible under the medical diagnosis exception because J.A.D. underwent the medical examination for "a combination" of purposes—medical as well as forensic. RP at 24. Williams objects to the admission of the statements on the basis that J.A.D. responded on cross-examination as follows:

Q Was it your understanding that the reason you were going to the hospital was to—so she could gather evidence about what had happened?

A Yes.

Q You didn't feel like you needed any specific medical treatment, did you?

A Not right at first.

RP at 114-15.

¶22 J.A.D.'s statement that she did not feel like she needed specific medical treatment "at first" does not demonstrate that her motive was purely forensic. RP at 115. She stated on direct examination that she was "mostly in shock" and "concerned about what [was] happening with [her] family" at the time. RP at 102. She did not state that her only purpose for going to the hospital was to gather evidence.

¶23 Under these circumstances, Williams fails to show that the context of J.A.D.'s statements indicate her intention to exclude medical diagnosis and treatment as a result of the hospital examination. Moreover, Jacobsen testified that the purpose of the questionnaire was twofold: to gather evidence and to identify treatable injuries. Jacobsen examined J.A.D. based on the history she obtained and, after the examination, provided J.A.D. with information on sexually transmitted diseases and the risk of pregnancy. She also used the questionnaire to determine what kind of follow-up referrals were necessary or helpful. And, although it appears that J.A.D. did not identify Williams as the assailant in her answers to the questionnaire, such a disclosure would have been admissible under ER 803(a)(4) to prevent future injury. Accordingly, the questionnaire and J.A.D.'s answers were reasonably pertinent to medical diagnosis and treatment.

¶24 The trial court did not abuse its discretion in allowing Jacobsen to testify about J.A.D.'s answers. Moreover, reversal is required only "where there is any reasonable possibility that the use of the inadmissible evidence was necessary to reach a guilty verdict." *State v. Guloy*, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985). Jacobsen's testimony was consistent with J.A.D.'s statements and any error in admitting Jacobsen's statements was harmless.

## C. ER 803(a)(2)

¶25 Williams also contends that the trial court erred in admitting J.A.D.'s statements to Sharon and Christina under the excited utterance exception to the hearsay rule, ER 803(a)(2). He asserts that the statements J.A.D. made to the Taylors at their house were inadmissible.

¶26 ER 803(a)(2) allows admission of an out-of-court statement offered to prove the truth of the matter asserted if it relates to "a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Before the trial court may admit a statement as an excited utterance, the proponent must satisfy three closely-related requirements. "First, a startling event or condition must have occurred. Second, the statement must have been made while the declarant was under the stress of excitement caused by the event or condition. Third, the statement must relate to the startling event or condition." *State v. Chapin*, 118 Wn.2d 681, 686, 826 P.2d 194 (1992). "The key determination is 'whether the statement was made while the declarant was still under the influence of the event to the extent that [the] statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment.'" *State v. Strauss*, 119 Wn.2d 401, 416, 832 P.2d 78 (1992) (alteration in original) (quoting *Johnston v. Ohls*, 76 Wn.2d 398, 406, 457 P.2d 194 (1969)).

¶27 Here, the record readily establishes the first and third requirements. The case involves a startling event, kidnap and rapes, and the challenged statements relate directly to the event. Williams's objection is based solely on the second requirement. The key to the second requirement is "spontaneity." *Chapin*, 118 Wn.2d at 688.

¶28 Williams claims that the record does not show spontaneity because J.A.D. responded to Sharon's questions, instead of making the statements voluntarily. According to Sharon's testimony, J.A.D. volunteered that she had been kidnapped and assaulted and later mentioned the rapes in response to Sharon's question. Williams misinter-

prets the law applicable to the excited utterance exception. Statements may be the result of an excited utterance even when made in response to a question. *Johnston*, 76 Wn.2d at 406; *State v. Williamson*, 100 Wn. App. 248, 258, 996 P.2d 1097 (2000). Whether J.A.D.'s statement was in response to Sharon's question is not a dispositive factor.

¶29 Williams also challenges the spontaneity of J.A.D.'s statements because J.A.D. washed her hair, changed her clothes, and collected her cell phone and camera before she walked to Sharon and Christina's home.

¶30 J.A.D. testified that she was at her own house for about 20 minutes and, during that time, she began to shower, changed her mind, put on fresh clothes, and found her cell phone and camera before she walked to the Taylor's. The record shows that J.A.D. called Sharon on her way to Sharon's house while walking in ditches to avoid Williams. Sharon could not understand what J.A.D. was saying because she was crying and hysterical. Sharon and Christina testified that when J.A.D. arrived at their house, she was crying, hysterical, and shaking badly, that "[h]er face was swollen and red around the eyes, and that they could see the duct tape marks on her wrists." RP at 141.

¶31 We are satisfied that the totality of the evidence establishes that J.A.D. was still under the influence of the event when she made the statements to Sharon and Christina, that neither the passage of time nor her attempts to clean herself up following Williams's attack allowed the emotional impact and stress of the kidnap and rapes to abate, particularly in light of her testimony that she walked in ditches because she feared that Williams would see her on her way to the Taylor residence.[8]

---

[8] Williams asserts that the cumulative error doctrine mandates a reversal. The cumulative error doctrine protects a criminal defendant's right to a fair trial and applies "to instances when there have been several trial errors that standing alone may not be sufficient to justify reversal but when combined may deny a defendant a fair trial." *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). Because Williams fails to show any error, he is not entitled to relief under the cumulative error doctrine.

**D. ER 612**

¶32 Williams also argues that the trial court erred in allowing Jacobsen to testify about J.A.D.'s statements to her because the State failed to use the proper procedure to refresh Jacobsen's memory.[9]

¶33 ER 612 governs the procedure for using a writing to refresh a witness's memory. A witness may use a writing to refresh his or her memory for the purpose of testifying if the adverse party has an opportunity to review the writing. The opposing party is entitled to cross-examine the witness from the writing and to introduce portions of it into evidence. ER 612.

> [T]he criteria for the use of notes or other memoranda to refresh a witness'[s] recollection are (1) that the witness'[s] memory needs refreshing, (2) that opposing counsel have the right to examine the writing, and (3) that the trial court be satisfied that the witness is not being coached—that the witness is using the notes to aid, and not to supplant, his own memory.

*State v. Little*, 57 Wn.2d 516, 521, 358 P.2d 120 (1961).

¶34 Here, when the State asked Jacobsen to go through the questions on the form, Williams objected that "[t]here is no indication of lack of memory." RP at 369. The State then asked Jacobsen to answer "[w]ithout looking at the exhibit." RP at 369. Despite Jacobsen's statement that she "[s]omewhat" had an independent memory of the questions she had asked J.A.D., her answers indicated that a writing could refresh her memory. RP at 367. For instance, she thought the first question was "how was [J.A.D.] penetrated," but, when the State directed her to read from the questionnaire, the first question was actually about the location of the incident. Moreover, Williams had an opportunity to examine the writing and cross-examine Jacobsen and the trial

---

[9] Williams also asserts that the trial court erred in allowing Jacobsen to read J.A.D.'s narrative statement because the State failed to use the proper procedure to refresh her memory. This argument also fails. Moreover, it would have been unreasonable to expect Jacobsen to remember and testify to a lengthy statement she took over a year before trial.

court demonstrated, by overruling Williams's objection and allowing her to read from the questionnaire, that it was satisfied she was not being coached.

¶35 The trial court did not abuse its discretion by allowing Jacobsen to refresh her memory by reading the questionnaire.[10]

¶36 Affirmed.

¶37 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

HOUGHTON, C.J., and PENOYAR, J., concur.

---

[10] Williams argues for the first time on appeal that J.A.D.'s statements to Jacobsen merely corroborate J.AD.'s earlier testimony about how the rapes occurred and were inadmissible as irrelevant. He also argues for the first time on appeal that Jacobsen's reading of J.A.D.'s narrative statement was highly prejudicial. We do not review an alleged error raised for the first time on appeal unless it is a "manifest error affecting a constitutional right." RAP 2.5(a)(3); *State v. Contreras*, 92 Wn. App. 307, 311, 966 P.2d 915 (1998).