Filed
Washington State
Court of Appeals
Division Two

April 13, 2021

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 53518-1-II |
| Respondent, | |
| v. | |
| MICHAEL ANDREW WILLIAMS, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—In January 2016, JP lost his apartment and began temporarily staying with a coworker, Michael Andrew Williams. A few weeks later, JP and Williams spent an evening drinking, and then Williams held JP down, strangled him, and raped him. The next day, JP notified law enforcement and went to the hospital, where a nurse performed a sexual assault examination. The nurse later testified at trial.

Williams appeals his conviction for second degree rape, arguing that the trial court erred by admitting certain statements JP made to the nurse during the sexual assault examination under the hearsay exception for statements made for medical diagnosis or treatment. Williams also argues that the use of JP's initials in court documents violated his constitutional rights. Williams contends that the trial court abused its discretion by denying his motion for a new trial. Williams also challenges the $200 criminal filing fee and interest on nonrestitution legal financial obligations, and he raises other arguments in a statement of additional grounds for review (SAG).

We conclude one statement that JP made to the sexual assault nurse was inadmissible, but the error was harmless. We remand to strike the provision in Williams's judgment and sentence

imposing interest on nonrestitution legal financial obligations. Otherwise, we affirm Williams's conviction and sentence.

FACTS

A.      Background

JP grew up in Tacoma, Washington and Georgia, where he lived with foster parents. He returned to Tacoma in 2014 at age 18. JP began working for a logistics company at the Tacoma port, where he worked with Williams.

In late 2015 and early 2016, JP lived in an apartment with his fiancée, Aislinn Turner. By January 2016, Turner had ended their relationship and moved out. JP was then evicted after starting an accidental grease fire that damaged the apartment.

In late January 2016, JP asked Williams if he could stay with him because he had nowhere else to go. Williams agreed and charged JP a modest rent to sleep on the couch at his studio apartment. JP did not know Williams well. JP, who was 20 years old, thought of Williams, who was 47, as an "uncle type" and felt he could trust him. Verbatim Report of Proceedings (VRP) (Aug, 30, 2018) at 344.

Williams told JP that he was bisexual when JP moved in. Williams then indicated he was interested in a sexual relationship with JP. JP told Williams he was straight and did not want a sexual relationship with Williams.

B.      Sexual Assault

JP and Williams worked the nightshift on weeknights for the logistics company. In mid-February 2016, JP and Williams spent a Saturday sleeping most of the day, and JP woke up around 8:00 or 9:00 p.m.

JP drank some alcohol that evening at the apartment before he and Williams walked to a bar in downtown Tacoma. JP was underage, but Williams gave him fake identification. JP testified that he had six shots of tequila and some beer. Initially, JP bought the drinks, but Williams bought at least one drink for JP.

JP testified that when he left the bar, he was drunk to the point of "[s]tupidity" and had never felt that drunk before, but Williams was only slightly intoxicated. VRP (Aug. 30, 2018) at 369. JP ate a couple of slices of pizza after leaving the bar. Back at the apartment, JP lay down because he still felt very drunk. Although the plan had been to go out again, JP felt too intoxicated to leave.

JP testified that Williams suddenly approached him and choked him. JP became dizzy, could not breathe, and urinated on himself. Williams removed all of JP's clothes while JP tried unsuccessfully to resist. Williams also took his own clothes off at some point.

JP testified that Williams then licked and bit his body. JP tried to get away but Williams dragged him across the floor. Williams performed oral sex on JP. JP continued to try to crawl away, but Williams dragged him back by the feet. Williams poured baby oil all over JP's body. Williams then anally raped JP without using a condom. JP testified that when Williams penetrated him, "[i]t really, really hurt" and he was in pain "until the next day." VRP (Aug. 30, 2018) at 395.

JP dressed, grabbed clothes and personal items, and quickly left the apartment. Williams's apartment was near Wright Park, so JP went to the park and called his ex-fiancée, Turner, while crying.

Turner lived in the neighborhood and happened to be walking near Wright Park when JP called, so she immediately found him. Turner testified that JP was "very upset[,] . . . in distress," "couldn't stop crying," and he repeatedly said that "he had been raped." VRP (Sept. 4, 2018) at

31-32. Turner did not have a car, so she called her grandmother. Turner and her grandmother drove JP to a hotel and dropped him off for the night.

C.        Sexual Assault Examination and Investigation

The next morning, JP's father took him to UW Medicine Valley Medical Center in Renton. A trained sexual assault nurse examiner, Monica Brown, examined JP. Brown interviewed JP using a standard sexual assault questionnaire. Brown asked JP to describe what happened and wrote verbatim statements in her notes. In the portion of the sexual assault questionnaire for the patient's current medical history, Brown addressed the amount of alcohol JP consumed, where it came from, and whether there was any "suspicion of surreptitious drug use" or "forced drug ingestion." Ex. 19A at 3. The medical history section also contained Brown's notes about JP's emotional state during and after the rape, including that Williams called JP names, threatened him, and JP felt his life was in danger. Brown also described the nature of the contact between Williams and JP.

Because JP reported strangulation, which may have life threatening consequences days after the event, Brown looked for symptoms of serious injury from strangulation and instructed JP to continue checking for symptoms at home. Brown collected swabs from various parts of JP's body for DNA testing. After the examination, Brown made treatment recommendations to other providers at the hospital and spoke to JP and his father about follow-up care.

Tacoma Police Officer Ryan Beck met with JP at the hospital after the examination. JP told Beck that Williams was the perpetrator, and Brown gave the completed sexual assault kit to Beck. A few days later, Tacoma Police Detective Philip Hoschouer interviewed JP and Turner and collected a reference sample of JP's DNA.

Hoschouer collected a reference sample of Williams's DNA after his arrest. Based on Hoschouer's investigation, the State charged Williams with second degree rape. The trial court appointed Travis Currie to represent Williams, who was indigent.

D.      Trial

The Pierce County Superior Court issued a bench warrant in October 2016, but law enforcement was unable to find and arrest Williams until December 2017. The trial took place a year and a half after the assault.

At trial, JP's testimony was mostly consistent with his prior statements. But on several occasions, JP's testimony was internally inconsistent, diverged from his prior statements, or he was unable to recall details. The State refreshed JP's memory using the transcript of his interview with Hoschouer when he testified about what kind of alcohol he drank, who purchased the drinks, whether Williams poured an oil on his body, and what names Williams called him during the assault.

During cross-examination, the defense impeached JP multiple times, including by asking JP to acknowledge he previously said he lay down on a futon that Williams normally slept on, rather than the floor, when he returned to the apartment. The defense impeached JP with prior inconsistent statements about when they purchased pizza and how much JP ate, and that a man named Jesse sometimes stayed at the apartment.

The State moved to admit JP's statements to Brown under the medical treatment or diagnosis hearsay exception. Outside the presence of the jury, the parties and the trial court discussed limitations on Brown's testimony and the trial court excluded several statements.

Brown testified about her examination of JP, and she quoted some statements JP made that she wrote down in her report. Williams attempted to raise a standing objection to all hearsay

5

testimony by Brown, but the trial court overruled the objection, instructing counsel to object to individual statements when appropriate.

Williams objected when Brown stated that JP told her they had been hanging out and drinking at a club. Williams also objected when Brown testified about drinking shots at the bar, explaining that JP said Williams "'just kept bringing them to me, and I just kept drinking them.'" VRP (Sept. 4, 2018) at 74.

Next, Williams objected when Brown testified that JP said Williams called him names and threatened him before the rape. Williams objected when Brown said JP told her penetration was the worst part and that he cried, screamed, and begged JP to stop. Williams also objected to the State's question about where the rape occurred and how Williams and JP were positioned.

Williams again objected when Brown testified about what happened at the park after the assault, reporting, "[JP] said that he sat there crying. He said, 'My ex-girlfriend came and helped and took me to a hotel for the night.'" *Id.* at 82. Finally, Williams objected when Brown stated that JP told her an oil was poured all over on his body.

Brown also described her examination of JP, noting that he had "bruising and marks on his neck" and small red dots behind his left ear, which Brown said can be signs of strangulation. *Id.* at 88, 94-98. JP also had visible blood vessels, known as petechiae, in the corners of his eyes, which was also consistent with strangulation. Brown saw some abrasions on the back of JP's right hand. Pictures of these injuries were admitted and published to the jury. Brown also noticed some swelling on JP's anus and JP reported tenderness, but she did not see lacerations or other significant injury. Brown testified that she collected swabs from JP's body for DNA testing.

Sean Carhart, a Washington State Patrol forensic scientist who analyzed the DNA evidence, also testified. Taken together, the swabs were consistent with JP's own DNA, Williams's

DNA, and that of an unknown male contributor. Williams's DNA was excluded as a source for one of the swabs containing unknown male DNA.

During the trial, the parties and the court referred to JP by his full name. The to convict instruction and a few pretrial documents referred to JP by his initials.

The jury found Williams guilty of second degree rape.

E.     Motion for New Trial and Sentencing

After trial and before sentencing, the trial court granted Williams's request for new counsel. Williams moved for a new trial, arguing that his original attorney provided ineffective assistance by failing to talk to or present the testimony of possible defense witnesses, including Jesse Ramirez and James Bloom, two acquaintances Williams said were at his apartment the evening of the alleged assault.

The defense investigator could not find Ramirez or Bloom, so Williams described the testimony he thought they would have given in his own affidavit. The trial court denied Williams's motion for a new trial. It found that even if Ramirez[1] had testified according to Williams's affidavit, that testimony would not have changed the outcome of the trial. The trial court concluded that Williams failed to establish ineffective assistance of counsel because he did not show prejudice resulted from the failure to locate and call additional witnesses.

During the sentencing hearing, the trial court asked Williams about his financial resources before imposing the $200 criminal filing fee. Williams's judgment and sentence contains a boilerplate provision imposing interest on all legal financial obligations at the rate applicable to civil judgments.

---

[1] The trial court's ruling focused on the effect of Ramirez's purported testimony because Williams stated his testimony was most germane.

Williams appeals his conviction, the $200 criminal filing fee, and the provision imposing interest on nonrestitution legal financial obligations. Williams also filed a SAG.

ANALYSIS

I. STATEMENTS MADE FOR TREATMENT OR DIAGNOSIS

Williams contends the trial court erred by ruling that Brown could testify about statements JP made during the sexual assault examination because the State failed to lay a foundation that Brown reasonably relied on the statements for medical treatment or diagnosis. Williams argues he was prejudiced by the error because the statements were necessary to corroborate JP's testimony, especially given the scant physical evidence. We disagree and conclude that all but one statement qualified for the medical treatment and diagnosis hearsay exception and the single improperly admitted statement was harmless.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered . . . to prove the truth of the matter asserted" and is generally inadmissible. ER 801(c), 802. There is an exception for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." ER 803(a)(4). The exception encompasses diagnosis or treatment of psychological conditions. *See, e.g.*, *State v. Woods*, 143 Wn.2d 561, 602, 23 P.3d 1046 (2001).

Under ER 803(a)(4), the proponent must show that "the declarant's motive in making the statement [was] to promote treatment and the medical professional . . . relied on it for the purposes of treatment." *State v. Burke*, 196 Wn.2d 712, 740, 478 P.3d 1096 (2021). In *Burke*, a rape victim did not expressly state her motive for going to the hospital, but the Washington Supreme Court

held that the trial court properly allowed the sexual assault nurse examiner to quote the victim's description of the assault because the description "was an answer to the first question [the nurse] asked," and "[m]edical professionals often ask patients how their injuries are caused." *Id.* at 741. The court inferred that the victim's answers to the nurse's specific questions about the assault were "likely motivated by a desire to promote medical treatment specific to sexual assault." *Id.* The court relied on inferences about the declarant's likely motive without requiring direct evidence of the declarant's motive. *Id.*

A declarant's statement may be admissible even if made for a combination of purposes, including both medical and forensic purposes. *See id.* at 717, 739-42; *see also State v. Williams*, 137 Wn. App. 736, 746-47, 154 P.3d 322 (2007).[2] In *Williams*, the State sought to admit testimony from a sexual assault nurse examiner about a rape victim's statements during the examination. 137 Wn. App. at 745. The victim testified that she originally went to the hospital for forensic purposes and did not initially feel she needed medical treatment. *Id.* at 747. However, we held that the victim's testimony did not render her statements to the nurse ineligible for the hearsay exception. *Id.*

Not all statements by a victim to a medical professional are admissible under this hearsay exception. *Burke*, 196 Wn.2d at 742. In *Burke*, the Supreme Court held that the victim's statement to the nurse describing the physical appearance of an unknown assailant was not admissible because no evidence suggested that the victim's "description of her assailant was made to promote medical treatment" nor was it relevant to preventing "the continued danger of intimate partner violence," since the victim and the assailant did not know each other. *Id.*

---

[2] This 2007 case involved a different defendant also named Michael Williams.

We review admissibility of evidence under a hearsay exception for abuse of discretion. *Id.* at 741.[3] Abuse of discretion occurs "when the trial court 'relies on unsupported facts, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its ruling on an erroneous view of the law.'" *State v. Arndt*, 194 Wn.2d 784, 799, 453 P.3d 696 (2019) (quoting *State v. Lord*, 161 Wn.2d 276, 284, 165 P.3d 1251 (2007)).

A.      JP's motive

Williams claims that the proponent of testimony admissible under this exception may not rely on an inference about the declarant's motives. Williams argues that JP lacked a treatment motive because he never expressly stated his reason for going to the hospital and Brown did not explicitly tell JP that the examination was related to medical treatment.

But we may infer JP's motive from testimony and context. *Burke*, 196 Wn.2d at 741. And, under *Williams*, JP may have had both medical and forensic motives. 137 Wn. App. at 746-47. JP went to the hospital and did not testify that his motives were purely forensic. Instead, JP testified that at the hospital "[t]hey checked me out from head to toe, swabbed me" and he talked to the nurse about what had happened, which is consistent with seeking medical care. VRP (Aug. 30, 2018) at 406. JP's description of his intoxication, how the rape occurred, including the strangulation, and his emotional state in its immediate aftermath, occurred in response to Brown's request that he describe what happened. As in *Burke*, "it is reasonable to believe that [JP] understood [that] question . . . to be the starting point for a medical exam." 196 Wn.2d at 741.

---

[3] Williams argues that we review the admissibility of JP's statements to Brown de novo, citing *State v. Gonzalez-Gonzalez*, which reviewed de novo whether an out-of-court statement was offered to prove the truth of the matter asserted. 193 Wn. App. 683, 689-90, 370 P.3d 989 (2016). But *Gonzalez-Gonzalez* distinguished between statements admitted as *nonhearsay* under ER 801, subject to de novo review, and statements subject to ER 803's *hearsay exceptions*, reviewed for abuse of discretion. *Id*. at 688-89.

B.       Brown's reliance on JP's statements

Brown explained that JP's description of the rape informed "what I was going to be looking for in terms of injuries and evidence collection" and was important to guide treatment. VRP (Sept. 4, 2018) at 68. Brown testified that JP's report of strangulation was crucial for her treatment recommendations because strangulation can have serious health effects that arise hours or days after the incident. After hearing JP's description of the event and conducting an examination, Brown spoke "to the medical personnel at the hospital, which is standard, let them know what [her] recommendations were in terms of follow-up assessment and care, [and] what kind of diagnostics and medication he might need." *Id.* at 69. Brown relied on JP's description of the rape for treatment purposes.

JP's statements about his intoxication and the circumstances around his drinking the night of the incident were reasonably pertinent to Brown's treatment. The current medical history portion of the sexual assault questionnaire prompted Brown to inquire whether JP was under the influence of substances and if there was any "suspicion of surreptitious drug use." Ex. 19A at 3. Brown noted that JP had consumed five to six shots of tequila and checked the no box for surreptitious drug use. Inquiries relevant to treatment reasonably included whether others had access to JP's drinks and whether it was possible a drug was added to a drink he had consumed. Whether Williams was giving JP drinks was responsive to the sexual assault questionnaire and relevant to Brown's treatment and diagnosis.

JP's description of being strangled, dragged, and held on the floor during the assault and rape, and his discussion of pain, including his comment that penetration was the worst part and that he cried, screamed, and begged Williams to stop, also informed Brown's examination and influenced her treatment recommendations. In the current medical history section of the

11

questionnaire, Brown noted "name calling" and recorded one of the comments JP reported Williams making during the assault. Ex. 19A at 3. Because Brown had an obligation to assess JP's need for psychological treatment, these statements were relevant to Brown's assessment of JP's trauma and need for mental health treatment or counseling. In fact, the sexual assault questionnaire prompted Brown to ask questions about the patient's emotional state and interest in counseling, and Brown checked the maybe box next to the question about interest in counseling and the yes boxes corresponding to questions about whether the patient perceived a life threat and whether the patient had social support. For these same reasons, JP's statements about his emotional state during and after the rape were also reasonably pertinent to Brown's assessment of JP's need for mental health treatment.

JP's statement that Williams poured an oil on his body was also pertinent to diagnosis or treatment. Brown documented this statement in the current medical history portion of the questionnaire in a subsection specifically addressing the type of contact between perpetrator and defendant. As part of the sexual assault examination, Brown had to look for and assess the severity of injuries only detectable due to visible marks on JP's body, such as abrasions, contusions, lacerations, swelling, redness, and bite marks. Oil or other lubrication on JP's skin could affect the appearance of these types of injuries, thus making JP's comment that Williams poured an oil on his body during the assault relevant to Brown's diagnosis and treatment.

Williams points out that Brown said, "Treatment is generally left to the medical personnel in whatever facility you're in." VRP (Sept. 4, 2018) at 62. But viewed in context, this comment reflects Brown's understanding of the practical and professional limits of her role as an on-call sexual assault nurse examiner who responded to hospitals throughout King County. Regardless of whether Brown administered treatment herself, JP's statements guided Brown's examination and

informed her treatment recommendations to other medical professionals and suggestions to JP and his family members for follow-up care.

Even if a different judge would have come to a different conclusion, we review evidentiary rulings for an abuse of discretion and reverse if *no* reasonable fact finder would have reached the same conclusion. *Burke*, 196 Wn.2d at 741. The trial court reasonably concluded that the statements described above were consistent with seeking medical care and Brown reasonably relied on JP's statements to guide her examination and make recommendations for treating JP's physical and psychological needs. The trial court did not abuse its discretion by admitting these statements under ER 803(a)(4). Accordingly, we do not address harmless error.

However, the trial court admitted Brown's testimony describing JP's comment that Turner "'came and helped and took [JP] to a hotel for the night.'" VRP (Sept. 4, 2018) at 82. That information, like the *Burke* victim's statement to the nurse describing the physical appearance of an unknown assailant, was not related to treatment or diagnosis. Thus, the trial court abused its discretion when it admitted this statement. But its admission was harmless error because both Turner and JP testified to these facts themselves and there was no dispute that Turner picked up JP and took him to a hotel for the night.

The admission of JP's statements to Brown does not constitute reversible error.

## II. USE OF JP'S INITIALS

Williams contends that the use of JP's initials in the to convict instruction was an impermissible judicial comment on the evidence that violated his due process rights and the presumption of innocence. Williams also argues that the use of JP's initials in court documents violated his right to a public trial. Applying *State v. Mansour*, we reject these arguments. 14 Wn. App. 2d 323, 329-33, 470 P.3d 543 (2020), *review denied*, 196 Wn.2d 1040 (2021).

In *Mansour*, Division One recently held that using a victim's initials in the jury instructions was not a judicial comment on the evidence because it did not convey an assumption that the defendant was guilty or otherwise violate the defendant's constitutional rights. *Id.* at 331. The *Mansour* court also concluded that use of initials in the to convict instruction and other court documents was not a court closure where the victim was referred to by their full name "in open court . . . throughout the proceedings . . . [and their] name was fully accessible . . . to any member of the public who appeared in court or read a transcript of the court proceedings." *Id.* at 333.

There is no reason to depart from *Mansour* here. The use of JP's initials in the to convict instruction was not a judicial comment on the evidence. *Id*. at 330. Nor did the use of JP's initials relieve the State of its burden of proof or violate Williams's constitutional rights. *Id.* at 331. The jury was instructed that the State had "the burden of proving each element of the crime beyond a reasonable doubt" and Williams was not required to prove reasonable doubt. Clerk's Papers (CP) at 28. And, as in *Mansour*, JP's full name was used throughout the trial and it appears throughout the report of proceedings. 14 Wn. App. 2d at 333. The presence of JP's initials in the jury instructions or other court documents was not a court closure and did not violate Williams's public trial rights.

### III. WILLIAMS'S CRR 7.5 MOTION FOR A NEW TRIAL

Williams argues that the trial court abused its discretion by denying his motion for a new trial on the basis that Currie's performance was deficient because he failed to call Ramirez and Bloom to testify. We reject this argument.

A trial court may grant a motion for a new trial if "substantial justice has not been done." CrR 7.5(a)(8). Ineffective assistance of counsel may constitute substantial injustice. *State v. Dawkins*, 71 Wn. App. 902, 906-07, 911, 863 P.2d 124 (1993). We review the trial court's denial

of a CrR 7.5 motion, including one brought on the basis of ineffective assistance of counsel, for an abuse of discretion. *Id.* at 906-07. We may affirm on any basis supported by the record. *Id.*

As an initial matter, Williams presented nothing beyond his own declaration stating what he thought Ramirez and Bloom would have said. Because Williams did not offer declarations from the witnesses themselves, the trial court properly denied the motion on that basis alone. *See State v. Bandura*, 85 Wn. App. 87, 93-94, 931 P.2d 174 (1997) (where defendant's posttrial motion "'is based on knowledge in the possession of others, [the defendant] may not simply state what [they think] those others would say, but must present their affidavits or other corroborative evidence.'" (quoting *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 885-86, 828 P.2d 1086 (1992))).

The trial court also did not abuse its discretion by concluding that Williams failed to establish ineffective assistance of counsel. The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. at 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). Ineffective assistance of counsel is a two-pronged inquiry. *Grier*, 171 Wn.2d at 32. Williams must show both that his counsel's performance was deficient and that counsel's deficient performance prejudiced him. *Id.* at 32-33. To prove prejudice, Williams would have to show that but for counsel's deficient performance, "there is a reasonable probability that the result of the proceeding would have been different." *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 538, 397 P.3d 90 (2017). We assess the "practical effect" of alleged ineffective assistance. *In re Pers. Restraint of Yates*, 180 Wn.2d 33, 41, 321 P.3d 1195 (2014).

Even if Williams's counsel performed deficiently, an issue we do not decide, Williams failed to show that he was prejudiced. According to Williams, Ramirez would have said that he let

himself into Williams's apartment "around midnight" on the night of the incident and did not witness a sexual assault. CP at 46-47. Williams claims Ramirez would have testified that he overheard Williams tell Turner on the phone that JP assaulted him and he encouraged Turner to contact law enforcement. Williams also said that Bloom would have testified that he was at Williams's apartment that evening and saw JP arrive high on drugs.

Even if Ramirez testified exactly as Williams described, there was no reasonable probability that the outcome of the trial would have been different. Testimony at trial indicated the rape most likely occurred between about 11:00 p.m. and 12:00 a.m. or 12:30 a.m. A reasonable jury could have found that Williams raped JP before Ramirez arrived. Moreover, Williams fails to establish how Ramirez could have testified about Williams's phone call with Turner in light of the hearsay rule and he could not have been prejudiced by the absence of inadmissible testimony. ER 801(c). And Bloom's purported testimony that JP was high on drugs likely would not have affected the outcome of the trial, given that JP himself testified that he was drunk to the point of "[s]tupidity." VRP (Aug. 30, 2018) at 369.

Williams asserts that even if "Ramirez was not present during [JP's] purported time frame of the alleged rape," Ramirez's testimony would have undermined JP's credibility, which was crucial to the State's case. Br. of Appellant at 40. But despite some inconsistencies, JP never wavered in his assertion that Williams raped him. Turner's testimony, Brown's findings that JP's symptoms were consistent with strangulation, and the pictures of JP's injuries corroborated core elements of JP's testimony. The practical effect of contradictory testimony from a witness present for only part of the evening would likely have been minimal. *Yates*, 180 Wn.2d at 41.

The trial court properly concluded that Williams failed to establish ineffective assistance of counsel. We affirm the denial of Williams's motion for a new trial.

IV. LEGAL FINANCIAL OBLIGATIONS

Williams argues that the trial court erred by imposing the $200 criminal filing fee because he was indigent. We disagree.

Williams did not object below to the trial court's limited inquiry into his ability to pay legal financial obligations. But we exercise our discretion to reach Williams's legal financial obligation arguments, as other courts have done under *State v. Blazina*, 182 Wn.2d 827, 834-35, 344 P.3d 680 (2015). *See, e.g.*, *State v. Glover*, 4 Wn. App. 2d 690, 693, 423 P.3d 290 (2018); *see also* RAP 2.5(a), 1.2(a) (liberally interpreting the rules of appellate procedure to promote justice and facilitate the decision of cases on the merits).

RCW 36.18.020(2)(h) prohibits imposing the criminal filing fee "on a defendant who is indigent as defined in RCW 10.101.010(3) (a) through (c)." Under RCW 10.101.010(3)(a) through (c), a person is indigent if he or she receives certain types of public assistance, is involuntarily committed to a public mental health facility, or receives an annual after tax income of 125 percent or less of the current federally established poverty level. But if the defendant is indigent under RCW 10.101.010(3)(d) (unable to pay the anticipated costs of counsel based on available funds), the trial court is not prohibited from imposing the criminal filing fee. *See* RCW 36.18.020(2)(h).

The trial court asked about Williams's income, assets, child support obligations, and debts, and Williams said he received a monthly army pension of $2,500, did not own real estate or valuable personal property, and had no child support obligations or other significant debt. Although the trial court signed an order of indigency under RCW 10.101.010(3)(d) for purposes of appellate counsel, it did not find him indigent under RCW 10.101.010(3)(a) through (c). The trial court thus appropriately inquired into Williams's income and debt and then decided to impose the criminal filing fee.

17

We agree with Williams that the trial court erred by imposing interest on nonrestitution legal financial obligations under RCW 10.82.090(1). The boilerplate provision in Williams's judgment and sentence imposing interest on all legal financial obligations at the rate applicable to civil judgments is improper, and we remand to strike this provision. *State v. Ingram,* 9 Wn. App. 2d 482, 501, 447 P.3d 192 (2019), *review denied*, 194 Wn.2d 1024 (2020).

V. STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

A.      Matters We Do Not Reach

Williams argues that his counsel failed to introduce exculpatory evidence in the form of receipts from a bar and Domino's Pizza. The receipts are not in the record. Under *State v. McFarland*, "if a defendant wishes to raise issues on appeal that require evidence or facts not in the existing trial record, the appropriate means of doing so is through a personal restraint petition." 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). Williams may raise this issue in a personal restraint petition, but we do not further review this issue here. *Id.*

Williams argues that his "[c]ounsel was unprepared for trial and failed to advance a defense authorized by statute where there [was] evidence to support the defense." SAG at 2. Under RAP 10.10(c), an appellant who files a SAG must "inform the court of the nature and occurrence of alleged errors." This assertion of error is too vague because Williams does not identify what defense that counsel failed to advance, and we do not further consider this argument.

Williams also argues that he lived three blocks from Multicare Tacoma General Hospital, but JP went to UW Medicine Valley Medical Center in Renton the next day. Because Williams does not identify the nature of any alleged error relating to this assertion, we do not reach the merits of this argument.

B.      Ineffective Assistance of Counsel

Williams argues that Currie's representation was ineffective because he failed to argue that JP made inconsistent statements about the incident. But Currie impeached JP with prior inconsistent statements multiple times and discussed JP's inconsistent testimony in closing. Williams has not shown deficient performance on this basis, and we reject this argument.

Williams also argues that Currie was ineffective because he failed to speak with witnesses Williams told him to contact. But where reasonable under the circumstances, a decision not to investigate a line of defense that counsel chose not to employ is not deficient performance. *Riofta v. State*, 134 Wn. App. 669, 693, 142 P.3d 193 (2006). Currie made a tactical decision to suggest that JP and Williams had consensual sex. To the extent Williams's argument refers to Currie's failure to speak with Ramirez and Bloom, for the reasons discussed above, including that neither person was present at the time of the assault, their testimony would not have helped Currie's chosen defense, and it was reasonable not to pursue these witnesses. We reject this ineffective assistance of counsel argument.

Finally, Williams argues that Currie did not adequately cross-examine the State's DNA expert because he did not ask the expert to disclose the facts or data underlying his acknowledgment that Williams's DNA could have been transferred to JP because they shared a living space. But there is no indication that additional questions about the basis for Carhart's expert opinion would have helped Williams's defense, especially where Carhart acknowledged that the defense's theory about transfer DNA was possible. Currie's cross-examination of Carhart did not fall below an objective standard of reasonableness and we reject this ineffective assistance argument. *Lui*, 188 Wn.2d at 538.

CONCLUSION

We affirm Williams's conviction. We remand to strike the provision in Williams's judgment and sentence imposing interest on nonrestitution legal financial obligations. Otherwise, we affirm Williams's sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, J.

We concur:

Sutton, A.C.J.

Maxa, J.