# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 56139-5-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| JOHN PAUL BECKMEYER, | |
| Appellant. | |

CHE, J. — Beckmeyer appeals the trial court's ruling excluding his prior statements made to medical providers as an abuse of discretion and violation of his right to present a defense. Beckmeyer also appeals the trial court's imposition of community custody supervision fees. In August 2020 after an argument, John Beckmeyer shot multiple rounds from his trailer window, killing James McDonald. At trial, Beckmeyer raised a self-defense claim. Beckmeyer sought to introduce out-of-court statements he made to medical providers several weeks prior to demonstrate his longstanding, subjective fear of McDonald. The trial court excluded the statements as inadmissible hearsay. Following a jury trial, Beckmeyer was found guilty of one count of second degree murder, two counts of second degree assault, and one count of fourth degree assault. Beckmeyer's judgment and sentence requires that he pay community custody supervision fees.

We hold that (1) the trial court did not abuse its discretion in excluding statements to medical providers, and even if the trial court erred in excluding the evidence, any such abuse was not prejudicial, (2) the trial court did not violate Beckmeyer's right to present a defense, and (3) the trial court erred in imposing the community custody supervision fees. We affirm Beckmeyer's convictions, reverse the imposition of community custody supervision fees, and remand for the trial court to strike the community custody supervision fees from Beckmeyer's judgment and sentence.

FACTS

John Beckmeyer and his girlfriend, Danielle Boucher, lived together in a fifth wheel trailer on a two-acre property owned by Beckmeyer's sister. James McDonald and Randi Benson, who had been in a romantic relationship for eight years, also lived on the property. Beckmeyer's sister was married to Benson's grandfather. Initially, McDonald and Benson lived in a motorhome on the property across from Beckmeyer and Boucher's fifth wheel trailer. A grassy area, used for barbequing, separated the motorhome and fifth wheel trailer. McDonald and Benson later moved into the main house on the property.

On August 26, 2020, Beckmeyer and Boucher were barbequing in the grassy area between the fifth wheel trailer and the motorhome. McDonald and Benson joined Beckmeyer and Boucher outside. The group was drinking alcohol and Boucher was playing music on a Bluetooth speaker. Beckmeyer asked Boucher to turn the music down. When Boucher did not turn the music down, Beckmeyer hit Boucher on the side of her head. McDonald confronted Beckmeyer about hitting Boucher and the two men began yelling at each other. While Benson consoled Boucher, Beckmeyer got up from the barbeque and returned to the fifth wheel trailer.

2

Although Benson heard Beckmeyer "say he was going to go get his .45," Boucher "didn't hear [Beckmeyer] say anything" before he returned to the fifth wheel trailer. 3 Rep. of Proc. (RP) at 1100, 1188.

McDonald left the barbeque area to retrieve a "double-barrel" shotgun from the main house. 3 RP at 1188. Boucher saw McDonald return "to the barbecue area . . . [and] point the shotgun towards [the window where Beckmeyer was] in his trailer." 3 RP at 1132. Benson saw McDonald returning with the shotgun "broken open,"[1] but did not see McDonald load or point the shotgun. Benson alleges that McDonald "said that he was going to defend himself." 3 RP at 1215.

After McDonald returned to the barbecue area, Benson saw "a black thing come out the window of the fifth wheel [trailer]." 3 RP at 1188. Beckmeyer, who was laying on his bed inside the fifth wheel trailer, stuck his gun outside the window and fired several shots. Benson and Boucher ducked to the ground. Bullets struck McDonald, piercing his lungs. McDonald died at the scene.

The State charged Beckmeyer with one count of first degree murder, or in the alternative one count of second degree murder, two counts of first degree assault, and one count of fourth degree assault.

I. WITNESS TESTIMONY

At trial, witnesses testified as described above. Beckmeyer asserted that he had acted in self-defense. Beckmeyer felt threatened by McDonald based on "[t]hings that happened in the

---

[1] When "broken open," a shotgun's chambers are exposed for loading and unloading ammunition. 3 RP at 1156.

past." 4 RP at 1461. Evidence of McDonald's propensity for violence was introduced through Boucher, Benson, and Beckmeyer's testimony.

Boucher testified that in 2019, following an accident concerning Beckmeyer's dog, McDonald pointed a BB gun at Beckmeyer's head. Boucher described another incident six weeks prior to the shooting when Boucher and McDonald got into an argument. Boucher could not recall what the argument was about but remembered that at some point McDonald "picked [Boucher] up and threw [her] on the ground." 3 RP at 1079. Although Beckmeyer was not present for the altercation, Boucher told Beckmeyer about what happened. Following that incident, Boucher and Beckmeyer went to the hospital for Boucher's injury. Boucher told the medical provider about her living situation.

Benson recalled the 2019 incident with Beckmeyer's dog. Benson did not remember McDonald pointing a BB gun at Beckmeyer, but did remember that Beckmeyer "threatened to hurt [McDonald]." 3 RP at 1184. In describing Boucher's altercation with McDonald, Benson explained that Boucher "just kept getting in [McDonald's] face and [that] he pushed [Boucher] over." 3 RP at 1185. Benson attributed Boucher's injury to her having "tripped and [fallen] over [a] stool" after McDonald pushed her. 3 RP at 1185. Benson characterized Beckmeyer and McDonald's relationship as sometimes "good and [that] other times it was like cats and dogs." 3 RP at 1183.

Following the shooting, detectives interviewed Beckmeyer. The recorded interview was played for the jury. During the interview Beckmeyer explained that McDonald "gets really violent" and "crazy sometimes." 4 RP at 1343, 1348. Beckmeyer told detectives that "about two months ago [McDonald] sent [Boucher] to the hospital" after having thrown her to the ground.

4 RP at 1342. Beckmeyer described having "had troubles in the past with [McDonald]," commenting that McDonald had "attacked [Beckmeyer] a couple times." 4 RP at 1346. At several points during the interview, Beckmeyer told detectives that McDonald had also attacked Boucher and Benson. Beckmeyer explained that McDonald previously "pulled a [BB] gun on [Beckmeyer]." 4 RP at 1372. In explaining why Beckmeyer shot McDonald, Beckmeyer expressed being afraid for his and Boucher's lives.

Beckmeyer's testimony during trial echoed his statements to the detectives. When asked about what was going through his head prior to the shooting, Beckmeyer focused his testimony on two prior incidents with McDonald. Beckmeyer first described his thoughts as "Oh, Jeez. [McDonald has] pointed a gun at me before, and . . . this time [McDonald has] a real firearm." 4 RP at 1461. Beckmeyer described the BB gun incident and the way McDonald "exploded," going from "calm and collective [sic] to . . . extremely mad and . . . yelling, screaming, tearing his shirt off, throwing his glasses on the ground." 4 RP at 1462. Beckmeyer described McDonald's behavior as "very threatening," causing Beckmeyer to question whether McDonald "was going to start throwing punches." 4 RP at 1464. Beckmeyer further testified that five weeks before the shooting, there had been a confrontation between Boucher and McDonald.

## II. EXCLUDED TESTIMONY

Prior to the start of trial, Beckmeyer sought to admit McDonald's prior bad acts "that relate to Mr. Beckmeyer's reasonable apprehension of danger." Clerk's Papers (CP) at 82. Beckmeyer argued that "[e]vidence of McDonald's prior bad acts [would] be introduced through testimony of Danielle Boucher, Dr. Wulff, ARNP Doyle, the law enforcement interview of Danielle Boucher, the law enforcement interrogation of Mr. Beckmeyer, and the testimony of

Mr. Beckmeyer." CP at 83. Beckmeyer explained that the "reasonableness of [his] fear that he was going to get shot and his reaction are informed by what he knew about McDonald's specific acts of a violent and volatile nature." CP at 77. Beckmeyer further argued that statements "to medical providers are independently admissible under ER 803(a)(3) & (4)." CP at 78. Beckmeyer asserted that evidence of McDonald's propensity for violence is "offered to establish that [Beckmeyer] reasonably feared McDonald because of what [Beckmeyer] knew at the time." CP at 78.

The trial court ruled that certain prior bad acts would be admissible. Although McDonald's assault of Boucher, attempted assault of Beckmeyer, and assault of Beckmeyer with a BB gun were admissible bad acts, the trial court declined "to try to describe . . . what evidence [would] be admissible to show those acts." 1 RP at 265.

During trial, Beckmeyer sought to introduce statements made to third parties and medical providers. Specifically, Beckmeyer sought to introduce his and Boucher's statements about their relationship with McDonald to nurse Christine Doyle and doctor Laura Wulff. Doyle co-managed Boucher's care and primarily focused on Boucher's "struggles with alcohol abuse." 4 RP at 1602. On July 14, 2020, Boucher, accompanied by Beckmeyer, sought treatment from Doyle. In her progress notes, Doyle noted that

> [Boucher] presents with tailbone pain x5 days.
> She states she got into a fight with her roommate [McDonald] and was body slammed into the ground.
>
> About 5 days ago [Boucher] got into a physical altercation with her roommate. Not feeling safe at home. [Boucher] has been distancing herself from housemate. Her partner, [Beckmeyer], states he has also experienced violence from his step-nieces boyfriend ([McDonald]). Both [Beckmeyer and Boucher] have been living in a motel for two days. [Beckmeyer's] sister passed from cancer and they were living in her house without issue until [McDonald] started living there. They don't

6

want to get a retraining (sic) order or contact the police. They are just going to stay away. [Boucher] is waiting to get into a detox program in NJ - Wednesday she will hear if she can get in. The[n] she plans to travel to NJ to be with her aunt.

CP at 132.

Next, Beckmeyer sought to introduce testimony through Wulff, Beckmeyer's primary care provider. Although Wulff saw Beckmeyer for his "blood pressure, some psych concerns, [and] depression," Wulff primarily treated Beckmeyer's chronic pain following his neck and back surgeries. 4 RP at 1591. On July 16, 2020, Beckmeyer met with Wulff "for a follow up chronic pain visit." CP at 133. In her progress notes, Wulff noted

Patient states that his pain overall is unchanged on his current regimen of Tramadol . . . . Functional goal he is working on: walking. Niece's boyfriend [McDonald] has a temper and has been abusive to other people living on the property (such as [Boucher]); [Beckmeyer and Boucher] have been staying in a motel.

CP at 133. Wulff made notes concerning Beckmeyer's medication regimen and post-surgery recovery progress. CP at 133. Wulff's report also captured Beckmeyer's statements concerning his living condition, noting that

[Beckmeyer] continues to report poor social situation and chaotic home life. Lives in a run-down 5th wheel w/o running water on sister's land; sister has died so house now occupied by [Benson/McDonald]. . . . Tries to care for [Boucher] (alcoholic).

CP at 133.

In seeking to introduce these statements made to Doyle and Wulff, Beckmeyer argued that the statements "are non-hearsay, or alternatively, admissible under exceptions to the hearsay rule." CP at 233. The State argued that "a doctor coming in to testify about some out-of-court statement is hearsay in this context." 3 RP at 1261. The State further argued that exclusion of the statements did not "prevent the defendant from presenting a defense in terms of his state of

7

mind as to self-defense because the jury's actually heard the evidence that's relevant on the issue of self-defense." 3 RP at 1261-62.

The trial court concluded that Beckmeyer's statements to medical providers were "not related to medical diagnosis or anything." 3 RP at 1265. The trial court explained that although the underlying incidents "could be relevant to reasonable fear, . . . the proper evidence of that coming in . . . is a different issue." 3 RP at 1266.

### III. VERDICT AND SENTENCING

Following a jury trial, Beckmeyer was found guilty of one count of second degree murder of McDonald, two counts of second degree assault of Boucher and Benson, and one count of fourth degree assault of Boucher. The jury returned special verdicts finding that Beckmeyer's assault against Boucher involved domestic violence against an intimate partner. The jury also returned special verdicts finding that Beckmeyer used a firearm in the commission of the second degree murder and in both counts of second degree assault. The trial court sentenced Beckmeyer to 347 months of confinement, 36 months of community custody, and ordered Beckmeyer to pay legal financial obligations (LFOs) comprised of mandatory fees, community custody supervision fees, and restitution.

Beckmeyer appeals.

### ANALYSIS

### I. STANDARD OF REVIEW

A trial court determines "whether evidence is relevant and admissible." *State v. Jennings*, 199 Wn.2d 53, 59, 502 P.3d 1255 (2022). This court reviews "the trial court's rulings for abuse of discretion." *Jennings*, 199 Wn.2d at 59. A trial court abuses its discretion where

"'no reasonable person would take the view adopted by the trial court.'" *Jennings*, 199 Wn.2d at 59 (quoting *State v. Atesbeha*, 142 Wn.2d 904, 914, 16 P.3d 626 (2001).

In determining whether a trial court erred in excluding evidence in violation of a defendant's Sixth Amendment right to present a defense, this court engages in a "two-step review process." *State v. Arndt*, 194 Wn.2d 784, 797, 453 P.3d 696 (2019). This court first reviews "the trial court's individual evidentiary rulings for an abuse of discretion." *Id*. Where a "'trial court abused its discretion in making an evidentiary ruling, and the ruling was prejudicial to the defendant,'" our inquiry ends. *Jennings*, 199 Wn.2d at 59 (quoting affirmingly *State v. Jennings*, 14 Wn. App. 2d 779, 800-01, 474 P.3d 599 (2020)) (Melnick, J., concurring)). However, where "'the abuse of discretion constituted harmless error'" or where a court's evidentiary rulings do not constitute abuse of discretion, this court next "consider[s] de novo whether the exclusion of evidence violated the defendant's constitutional right to present a defense." *Jennings*, 199 Wn.2d at 58-59 (quoting *Jennings*, 14 Wn. App. 2d at 800-01 (2020)).

## II. REVIEW OF EVIDENTIARY RULINGS FOR ABUSE OF DISCRETION

A. *Hearsay*

Hearsay evidence is not admissible except as provided by the rules of evidence, other court rules, or by statute. ER 802. Under ER 801(c), "hearsay" is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." Determining whether "an out-of-court statement is hearsay depends on the purpose for which the statement is offered." *State v. Duarte Vela*, 200 Wn. App. 306, 319, 402 P.3d 281 (2017).

1. *ER 803(a)(4)—Statements for Purposes of Medical Diagnosis or Treatment*

Beckmeyer argues that the "trial court erred when it excluded testimony regarding [his prior] statements to medical providers" because the statements "were pertinent to treatment" and admissible under ER 803(a)(4). Br. of Appellant at 21, 33. We disagree.

ER 803(a)(4) provides an exception to the hearsay rule for statements "made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." A statement is reasonably pertinent to diagnosis or treatment where "(1) the declarant's motive in making the statement is to promote treatment and (2) the medical professional reasonably relied on the statement for purposes of treatment." *State v. Williams*, 137 Wn. App. 736, 746, 154 P.3d 322 (2007).

However, statements made for the purpose of a medical diagnosis or treatment that identify the perpetrator of a crime are not admissible under ER 803(a)(4). *State v. Ashcraft*, 71 Wn. App. 444, 456, 859 P.2d 60 (1993). But in domestic violence situations, "a declarant's statement disclosing the identity of a closely-related perpetrator is admissible under ER 803(a)(4) because part of reasonable treatment and therapy is to prevent recurrence and future injury." *Williams*, 137 Wn. App. at 746.

Here, the trial court properly excluded Beckmeyer's statements to medical providers, Doyle and Wulff, on the basis that the statements were "not related to medical diagnosis." 3 RP at 1265. First, Beckmeyer's statement to Doyle during Boucher's appointment that Beckmeyer had experienced violence from McDonald did not promote or relate to Boucher's injury and Doyle's treatment or diagnosis of Boucher. Beckmeyer was not Doyle's patient, nor was he

seeking treatment from Doyle. Doyle, was treating Boucher for a tailbone injury. Boucher had already explained to Doyle how Boucher sustained the injury in an altercation with McDonald. Beckmeyer's statement did not describe Boucher's "medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." ER 803(a)(4). Beckmeyer's statement that he also experienced violence from McDonald provided no information that Doyle could reasonably rely on in diagnosing or treating Boucher's tailbone injury.

Next, although Beckmeyer was seeking treatment from Wulff, his statements about McDonald were not pertinent to his treatment or diagnosis. Wulff, Beckmeyer's primary care provider, met with Beckmeyer "for a follow up chronic pain visit" following his neck and back surgeries. CP at 133. Wulff's report notes that Beckmeyer stated McDonald "has a temper and has been abusive to other people living on the property (such as [Boucher]); [Beckmeyer and Boucher] have been staying in a motel." CP at 133. Wulff's progress report also notes that Beckmeyer "continues to report poor social situation and chaotic home life." CP at 133.

Beckmeyer does not explain how these statements to Wulff concern Beckmeyer's medical history, a past or present symptom, pain, or sensation relevant to Wulff's treatment of Beckmeyer's chronic pain following his neck and back surgeries. Whether McDonald had a temper is unrelated to Beckmeyer's treatment or diagnosis. Beckmeyer's statement that McDonald has been abusive *to others* on the property does not implicate Beckmeyer's treatment or diagnosis. In the absence of a relevant link between Beckmeyer's chronic pain and Beckmeyer's statement about McDonald's temper towards other people, Beckmeyer's statement

to Wulff was unrelated to his diagnosis and treatment. Also, Beckmeyer does not explain how or if Wulff relied on Beckmeyer's statements in providing treatment.

Furthermore, although Beckmeyer, Boucher, Benson, and McDonald lived on the same property, Beckmeyer did not share a residence with McDonald. Beckmeyer was not in any intimate relationship with McDonald nor was he related to McDonald. Therefore, the trial court's decision to exclude Beckmeyer's statements to Doyle and Wulff under ER 803(a)(4) is not an abuse of discretion.

2. *ER 803(a)(3)—Then Existing Mental, Emotional, or Physical Condition*

Beckmeyer argues that his statements to Wulff, that McDonald had a temper and has been abusive to others living on the property, were also admissible under ER 803(a)(3) as "'statements of the declarant's then existing state of mind.'" Br. of Appellant at 35 (quoting ER 803(a)(3)). Beckmeyer posits that the statements were relevant to a jury's full understanding of Beckmeyer's state of mind regarding Beckmeyer's ongoing fear of McDonald. We disagree that the statements were admissible under ER 803(a)(3).

Under ER 803(a)(3), a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition . . . , but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will," is not excluded by the hearsay rule. The use of "'then' in the term 'then-existing' refers to the time the statement was made, not the earlier time the statement describes." *State v. Sanchez-Guillen*, 135 Wn. App. 636, 646, 145 P.3d 406 (2006). A statement "discussing the conduct of another person that may have created the declarant's state of mind [is]

inadmissible under ER 803(a)(3)." *State v. Sublett*, 156 Wn. App. 160, 199, 231 P.3d 231 (2010).

Here, Beckmeyer's statement to Wulff that McDonald "has a temper and has been abusive to other people living on the property" is not a statement of Beckmeyer's then existing state of mind. CP at 133. Beckmeyer's statement describes McDonald's past conduct. Furthermore, Beckmeyer's statement does not pertain to his *own* state of mind but rather describes McDonald's past interactions with others. Accordingly, Beckmeyer's statement to Wulff is not a statement of his then existing state of mind.

Thus, the trial court did not abuse its discretion in excluding Beckmeyer's statement to Wulff under ER 803(a)(3).

B.      *Self-Defense—State of Mind Evidence*

Alternatively, Beckmeyer argues that his statements to Doyle and Wulff were not hearsay, i.e., offered for the truth of the matter asserted, but were instead offered to show Beckmeyer's state of mind and longstanding fear of McDonald. We disagree because even if the statements were relevant to Beckmeyer's state of mind, there is no prejudice as the statements were cumulative.

Under RCW 9A.16.050, homicide is justifiable when it is committed in "the lawful defense of the slayer . . . when there is reasonable ground to apprehend a design on the part of the person slain to . . . do some great personal injury to the slayer . . . and there is imminent danger of such design being accomplished." A successful self-defense claim requires "'evidence that (1) the defendant subjectively feared that he was in imminent danger of death or great bodily harm; (2) this belief was objectively reasonable; [and] (3) the defendant exercised no greater

force than was reasonably necessary.'" *State v. Werner*, 170 Wn.2d 333, 337, 241 P.3d 410 (2010) (quoting *State v. Callahan*, 87 Wn. App. 925, 929, 943 P.2d 676 (1997)).

In evaluating a self-defense claim, the "vital question is the reasonableness of the defendant's apprehension of danger, and his good faith in acting upon such apprehension." *State v. Ellis*, 30 Wash. 369, 373, 70 Pac. 963 (1902). Accordingly, the "jury are entitled to stand as nearly as practicable in the shoes of defendant, and from this point of view determine the character of the act." *Id.* Evidence demonstrating "a victim's propensity toward violence that is known by the defendant is relevant to a claim of self-defense 'because such testimony tends to show the state of mind of the defendant . . . and to indicate whether he, at that time, had reason to fear bodily harm.'" *Duarte Vela*, 200 Wn. App. at 319 (quoting *State v. Cloud*, 7 Wn. App. 211, 218, 498 P.2d 907 (1972)). Evidence "that the defendant was aware of specific acts of violence committed by the victim" is "admissible as justifying forceful acts of the defendant in self-defense." *State v. Walker*, 13 Wn. App. 545, 549, 536 P.2d 657 (1975).

Although relevant evidence is generally admissible, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." ER 402, 403.

Here, Beckmeyer attempted to introduce his statements to Doyle and Wulff for the purpose of demonstrating the reasonableness of his fear concerning McDonald. Even assuming without deciding that the statements were relevant to Beckmeyer's state of mind and fear of McDonald, the trial court's ruling excluding the statements was not prejudicial because the evidence was cumulative. *See Jennings*, 199 Wn.2d at 59-60.

14

Evidence that Beckmeyer was familiar with McDonald's temper and violent behavior along with the fact Beckmeyer and Boucher were staying in a motel was introduced through several other witnesses, including Beckmeyer himself. First, Boucher testified that McDonald had previously "barge[d] into the [couple's] fifth wheel in a rage," "screaming at [Beckmeyer]" while pointing a BB gun at Beckmeyer's head. 3 RP at 1125. Boucher further testified that McDonald had picked her up and thrown her to the ground during an argument and that she had told Beckmeyer about the incident. Benson's testimony explained that Beckmeyer and McDonald's relationship was good sometimes, "and [that] other times it was like cats and dogs." 3 RP at 1183.

Additionally, the jury listened to Beckmeyer's interview with detectives following the shooting. During the interview, Beckmeyer explained that two months prior to the shooting, McDonald had "beaten up" Boucher and "sent her to the hospital." 4 RP at 1342. Beckmeyer described McDonald as "really violent" and capable of getting "really crazy sometimes." 4 RP at 1343, 1348. Beckmeyer explained that he has "had troubles in the past with [McDonald]," and that McDonald had "attacked [Beckmeyer] a couple times." 4 RP at 1346. Beckmeyer reiterated his allegation, stating McDonald has "already beat on me once. And he's beat up on his girlfriend. And he's already beat my girlfriend." 4 RP at 1354. Beckmeyer also told detectives that McDonald had previously gone "crazy" and "pulled [a] BB gun on [Beckmeyer]." 4 RP at 1372. After learning about McDonald's death, Beckmeyer acknowledged that McDonald was a "good guy" but that "he used to have big anger problems." 4 RP 1412. Beckmeyer explained that he "was afraid because . . . [McDonald] attacked [Beckmeyer's] girlfriend, bruised her tail bone bad," and left "a huge bruise" on her arm. 4 RP at 1412.

15

Finally, Beckmeyer's own testimony, provides evidence of his state of mind. Counsel specifically asked what was going through Beckmeyer's mind when he saw McDonald approaching with a shotgun. Beckmeyer explained that he thought "Oh, Jeez. [McDonald has] pointed a gun at me before, and then I go this time [McDonald has] a real firearm." 4 RP at 1461. Beckmeyer explained that McDonald had pointed a BB gun at him "a year or so prior." 4 RP at 1462. When asked whether "there [had] been other instances in which [McDonald] ha[d] been threatening to [Beckmeyer] or [Boucher]," Beckmeyer explained that he was aware of the incident between Boucher and McDonald. 4 RP at 1464.

Even if Beckmeyer's statements to Doyle and Wulff may have been relevant to show his state of mind, such evidence was cumulative. The substance of the excluded evidence contained in Beckmeyer's statements to Doyle and Wulff was admitted through Boucher, Benson, and Beckmeyer's testimony. Accordingly, even if Beckmeyer's statements to Doyle and Wulff were relevant to show Beckmeyer's state of mind, the trial court did not abuse its discretion in excluding those statements because the statements were cumulative evidence.

Under *Jennings*, when "'the trial court abused its discretion in making an evidentiary ruling, and the ruling was prejudicial to the defendant, we would avoid the constitutional issue altogether.'" 199 Wn.2d at 59 (quoting *Jennings*, 14 Wn. App. 2d at 800-01 (Melnick, J., concurring)). However, where, the trial court's abuse of discretion is harmless or where, the trial court does not abuse its discretion, then we proceed to consider the constitutional issue. *Jennings*, 199 Wn.2d at 59. Here, even if the excluded statements were relevant to Beckmeyer's state of mind, the trial court's exclusion of the statements was not prejudicial because the

excluded statements were cumulative; therefore, we now turn to Beckmeyer's Sixth Amendment argument.

### III. SIXTH AMENDMENT RIGHT TO PRESENT A DEFENSE

Beckmeyer argues that "the trial court's exclusion of the evidence deprived [him] of his right to present a complete defense, and [that] the error was not harmless beyond a reasonable doubt." Br. of Appellant at 38. Beckmeyer contends that the evidence was relevant and that "the State cannot demonstrate the evidence was 'so prejudicial as to disrupt the fairness of the fact-finding process.'" Br. of Appellant at 39. The State argues that Beckmeyer "was not denied his right to present a complete defense and any such denial was harmless beyond a reasonable doubt because the evidence was cumulative to other admissible evidence." Br. of Resp't at 28. We agree with the State.

A criminal defendant has a constitutional right to present a defense. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. However, this right is not absolute and may "'in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process' . . . including the exclusion of evidence considered irrelevant or otherwise inadmissible." *State v. Giles*, 196 Wn. App. 745, 756-57, 385 P.3d 204 (2016) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S. Ct. 1038. 35 L. Ed. 2d 297 (1973). Under the Constitution, judges may "'exclude evidence that is repetitive . . ., only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.'" *Jennings*, 199 Wn.2d at 63 (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d. 503 (2006)).

Where "evidence is relevant, the reviewing court must weigh the defendant's right to produce relevant evidence against the State's interest in limiting the prejudicial effects of that

evidence to determine if excluding the evidence violates the defendant's constitutional rights." *Jennings*, 199 Wn.2d at 63. Evidence demonstrating "a victim's violent actions may be admissible to show the defendant's state of mind at the time of the crime and to indicate whether he had reason to fear bodily harm." *State v. Burnam*, 4 Wn. App. 2d 368, 376, 421 P.3d 977 (2018). There is "a distinction between evidence that merely bolsters credibility and evidence that is necessary to present a defense." *Jennings*, 199 Wn.2d at 66-67.

A violation of an individual's right to present a defense is "subject to constitutional harmless error review." *State v. Orn*, 197 Wn.2d 343, 359, 482 P.3d 913 (2021). An error is harmless where the State proves "'beyond a reasonable doubt that the jury would have reached the same verdict without the error.'" *Id.* (quoting *Romero-Ochoa*, 193 Wn.2d 341, 347, 440 P.3d 994 (2019)).

As discussed above, testimony concerning Beckmeyer's knowledge of McDonald's history of violence was introduced through Boucher, Benson, and Beckmeyer's testimony, as well as Beckmeyer's recorded statements to detectives. Beckmeyer testified that he had knowledge of Boucher's interaction with McDonald and of her resulting injury. Beckmeyer explained to the jury that the couple stayed in a hotel after Benson's injury. Beckmeyer further testified that a year prior to the shooting, McDonald had pointed a BB gun at Beckmeyer. Furthermore, Beckmeyer testified that in the moments before the shooting, his thoughts focused on McDonald's prior violent acts. The jury also heard Beckmeyer's recorded statements to detectives that included Beckmeyer reciting these incidents multiple times during the interview. Moreover, Boucher and Benson's testimony confirmed these incidents between Beckmeyer and

18

McDonald. Accordingly, Beckmeyer had the opportunity to present his theory of the case and present evidence relating to his longstanding subjective fear of McDonald.

Statements made by Beckmeyer to Doyle and Wulff are cumulative as they were introduced numerous times through Boucher, Benson, and Beckmeyer's testimony, as well as Beckmeyer's recorded statement to detectives. Rather than provide new evidence for the jury's consideration, Doyle and Wulff's testimony would only serve to bolster Beckmeyer's credibility concerning his longstanding fear of McDonald. Given the cumulative nature of the evidence, Beckmeyer's ability to testify and present his theory of the case, the trial court did not err in excluding Beckmeyer's statements made to Doyle and Wulff.

Furthermore, even if the trial court erred in excluding statements made to Doyle and Wulff, we are assured beyond a reasonable doubt that the jury would have reached the same verdict without the error. The general statements that Beckmeyer made to Doyle and Wulff were introduced through witnesses who gave detailed accounts of the incidents between McDonald and Beckmeyer. Thus, the jury would not have reached a different verdict had they been able to consider the excluded evidence.

Accordingly, we conclude that the trial court did not deny Beckmeyer his right to present a complete defense and even if it did, any such denial was harmless beyond a reasonable doubt.

IV. COMMUNITY CUSTODY SUPERVISION FEES

Beckmeyer argues that his "community custody supervision fee should be stricken [from his judgment and sentence] because it is a discretionary legal financial obligation, which the trial court intended to waive." Br. of Appellant at 43. Beckmeyer further argues that "[i]n the alternative, defense counsel was ineffective for failing to alert the court that . . . the written

judgment and sentence did not waive the fee[s]." Br. of Appellant at 48. The State concedes that this "court should strike the Community Custody Supervision fee." Br. of Resp't at 35. We agree.

Under former RCW 9.94A.703(2)(d) (2018), a trial court could waive community custody supervision fees. In 2022, the legislature amended RCW 9.94A.703(2) and removed subsection (d). *See* SECOND SUBSTITUTE H.B. 1818, 67th Leg., Reg., Sess. (Wash. 2022). The amended statute does not provide for the imposition of community custody supervision fees. RCW 9.94A.703. Costs imposed under former RCW 9.94A.703(2)(d) were not final until the termination of all appeals. *State v. Wemhoff*, 24 Wn. App. 2d 198, 202, 519 P.3d 297 (2022). The cost statute "in effect at the conclusion of a defendant's appeal appl[ies] to a defendant's case." *Id.*

Here, the trial court imposed community custody supervision fees after expressing an intent to only impose mandatory LFOs. In its oral sentencing, the trial court ordered that the LFOs be "basically just the mandatory minimum." 6 RP at 2204. However, Beckmeyer's judgment and sentence requires that he "pay supervision fees as determined by DOC." CP at 442. In light of amended RCW 9.94A.703(2) and the record's suggestion that the trial court intended to waive discretionary LFOs under former RCW 9.94A.703(2)(d), we reverse the imposition of the community custody supervision fee and remand to the trial court to strike the community custody supervision fees from Beckmeyer's judgment and sentence.

## CONCLUSION

We hold that the trial court did not err in excluding statements by Beckmeyer to Doyle and Wulff because the statements were inadmissible hearsay and cumulative. We further hold

that the trial court did not violate Beckmeyer's right to present a defense, but the trial court improperly imposed the community custody supervision fee. Consequently, we affirm Beckmeyer's convictions, reverse the imposition of community custody supervision fees, and remand for the trial court to strike the community custody supervision fees.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Lee, P.J.

Price, J.